BENEDICT GINSBERG AND ADELE W. GINSBERG, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3273-64. Filed April 19, 1966.

*Benedict Ginsberg*, pro se.
*Bernard Goldstein*, for the respondent.

The Commissioner determined a deficiency of $161.25 in petitioners' income tax for the year ended December 31, 1959. The sole question presented is whether $375 paid by petitioners in 1959, was paid to a charitable organization and was therefore deductible under section 170 of the 1954 Code as a charitable contribution.

FINDINGS OF FACT

Benedict and Adele W. Ginsberg, husband and wife, residing in Larchmont, N.Y., filed a joint Federal income tax return for the taxable year 1959 with the district director of internal revenue, Manhattan district, New York. The husband will hereinafter be referred to as petitioner.

The village of Larchmont (hereinafter sometimes referred to as the village) borders on Long Island Sound. At one point in what is referred to as Larchmont Harbor there is an indentation of the coast about 800 or 900 feet wide, and there lies across this indentation for about seven-eighths of that width an island named Cedar Island, which is connected with the mainland at one end by a small bridge. The island is divided into 4 lots with a house on each lot. Behind or landward of the island there are several narrow water areas or inlets or coves known as Little Harbor Sound, Buccaneer Channel, and Spanish Cove, and there are about 25 mainland lots that border on these water areas. There are houses on some of these lots; other lots are vacant. In a few instances the same person owns more than one of the lots. The entire area is sometimes known as Larchmont Shores and it constitutes about 2 percent of the village of Larchmont. Flint Park, the largest recreational area in the village, also borders to some extent along a portion of Little Harbor Sound.

The foregoing inlets or coves were shallow and for about 3 hours at low tide contained no water. Aside from the unnavigability of the waterways during these periods, the exposed muddy land gave off an offensive odor. The property owners in the area were concerned about this condition, and a proposal to remedy the situation by dredging these waterways was suggested to the board of trustees of the village by one of the property owners, William Eipel, at its meeting on November 5, 1956. He stated at that time that the property owners wanted to have the areas dredged at their own expense and were wondering whether the village would allow the silt to be pumped onto a portion of Flint Park.

The project of dredging was actually initiated by another resident of the area, L. Byron Cherry, who discussed it with various people, and at a meeting in his home he described the desirability of the project. As a result of suggestions made by him and others there was organized on or about May 16, 1957, the Larchmont Committee for Contributing to the Development of a Storm Haven for Small Craft, Inc. (hereinafter sometimes referred to as the association). The certificate of incorporation sets forth the alleged purposes for which the association was formed as follows:

a) To provide a haven or refuge in time of danger from storms or the elements, for small craft in distress.

b) To dredge the waterways or channels known as Spanish Cove, Buccaneer Channel and Little Spanish Cove, located inside Larchmont Harbor in the inlets between Cedar Island, Hummocks Point and the mainland, for the purposes stated above and for the further purposes of improving the health, recreational and other considerations of such waterways or channels.

c) To maintain such waterways or channels and adopt rules therefor.

Petitioner, one of the residents and property owners in the area, is a practicing lawyer, and performed various legal services without fee in connection with the project, including the incorporation of the association. The first board of directors of the association consisted of five persons all of whom had waterfront homes in the area; they were William Eipel, Cherry, petitioner, and two others named Wiehe and Covert.

Prior to the filing of its certificate of incorporation (or at least prior to May 31, 1957), an "Agreement to Subscribe to Membership" in the association was signed by 14 persons, including petitioner, all of whom owned property on the borders of the waterways to be dredged. The agreement set forth the names of 21 of the 22 persons owning shorefront property in that area of Larchmont (including the 4 owners of property on Cedar Island), and the amount which each would be expected to contribute to the association. The name of the remaining property owner, Joseph Ginsberg, was not listed. It does not appear from the record that he was ever solicited for a contribution to the association, or that one was made with respect to the property owned by him.

It was estimated that $25,000 would be required to perform the contemplated dredging and the amount to be "contributed" by each property owner was a stated percentage of that $25,000 estimated cost. The respective payment expected of each such property owner was computed upon the basis of a formula which imposed the burden in an equitable manner upon those who would benefit from the project. That formula was based upon four factors, weighted originally as follows:

1) 50% of the amount of subscription to be determined on the basis of ownership of property fronting on the water;

2) 20% to be determined on the basis of the assessed value of the property;

3) 20% to be determined on the basis of the number of feet of water front of the property; and

4) 10% to be determined on the basis of the total number of square feet in the property.

The formula was subsequently revised so as to give equal weight to the last three factors at 16⅔ percent each. As thus revised the percentage applicable to each property owner was determined with specificity to two decimal places. Thus, petitioner's subscription was fixed at 4.02 percent of the total amount required, Cherry's at 4.21 percent, Eipel's at 5.93 percent, Covert's at 3.61 percent, and Wiehe's at 3.79 percent.

During the years 1957–59 a total of $22,045 was collected by the association with disbursements having been made in 1959 of $21,583 and in 1960 of at least $200.[1] The total amount paid to the association by petitioner was $1,000—$250 in 1957, $375 in 1958, and $375 in 1959.

About 90 or 95 percent of the shorefront property on the waterways to be dredged was privately owned. The municipal property abutting or adjacent to these waterways is part of Flint Park. It has not been used by the public for ingress and egress of craft, and there is no evidence that it was used for swimming or that swimming was permitted there. Some persons use the area for fishing, but such activity appears to be unlawful.

One of the important problems in respect of the project was the disposition of the silt to be dredged. The simplest solution appeared to be to pump it onto a portion of Flint Park. If it could not be deposited in some convenient nearby place, it would be necessary to load the dredged material in barges to be transported by sea to Stamford, Conn., or some other place, at a cost of about six times as much. On May 20, 1957, Eipel, Covert, and Wiehe appeared before the village board of trustees to make a formal presentation of the association's plan. It was contemplated that:

the materials to be removed could be used to fill the low lying land of the southeast portion of Flint Park which would provide the needed area for further extension of the park facilities; the property owners involved would pay all costs of pumping the fill to Flint Park and require the contractor to provide property damage and public liability insurance; and the Village is requested to provide for all work to be done on the Village property, * * *

At the meeting of the board of trustees on June 3, 1957, the use of the material to be dredged as fill to provide a baseball or football field in Flint Park was discussed with respect to the amount of fill needed and the acceptability of that material as fill.

On July 1, 1957, the following resolutions were adopted by the board of trustees.

---

[1] The balance of $262 has not been accounted for in this record.

RESOLVED, that the Board approves the proposed dragline dredging to be done on the Eipel and A. A. Wyn properties and that the Village will accept up to 2500 yards of fill to be trucked to the low area in Flint Park along the creek; and be it further

RESOLVED, that the foregoing is approved only on condition that the Village is completely indemnified and held harmless from any public liability or property damage during the entire operation; that adequate fencing be provided for proper protection; and be it further

RESOLVED, that Engineer Griffin shall oversee the proper execution of all the aforesaid conditions and necessary precautions.

It was estimated that the village would save approximately $15,000 by using the dredged material instead of having to purchase fill for the ball field in Flint Park, assuming that the village would otherwise have purchased such fill. However, the dredged material was a liability rather than an asset in the hands of the association, since, as noted above, the cost of the project would have been six times as much if it were unable to deposit such material at a nearby site.

It later developed that it would not be feasible to use the dragline method of dredging, and the association proposed that the material be hydraulically removed from the waterways through a pipeline. In connection therewith, the board of trustees, on December 15, 1958, resolved as follows:

RESOLVED, that the Board will approve acceptance of fill for Flint Park from the proposed dredging by the Larchmont Shores Association of the Spanish Cove and adjacent water ways, which dredging will be done hydraulically, under the following conditions:

1. There shall be no dumping of dredged material on Village property within 250 feet of the houses on Old Colony Drive.

2. Adequate fencing and dykes shall be erected and, if the Village accepts the material, the Village will reimburse said Association for the cost of said fencing and dykes.

3. Only material which the Village decides is suitable for its use will be accepted.

4. Adequate liability and property damage insurance of minimum limits of $300,000. shall be provided.

5. Adequate contract insurance protecting the Village from any suits arising out of the work, weather or negligence of the contractor must be provided.

6. The Village Engineer and Board shall approve the contract for this dredging operation.

7. The Village Engineer shall supervise operations of this dredging and shall have the right to order the dredging to be stopped at any time he deems it advisable, without any liability on the part of the Village.

The dredging operation began on or about March 20, 1959, and was concluded on June 10, 1959. A total of 23,500 yards of material was dredged, approximately 15,000 yards of which was deposited on the Flint Park land. After the dredging there was a "good one foot at low water" except in extreme cases, so that the waterways were navigable to some extent at almost all times and the offensive odor was eliminated.

As previously noted, the association collected a total of $22,045 during the years 1957–59. In addition to the amounts paid by the original 14 signatories to the subscription agreement, the association received payments from four of the seven remaining owners of shorefront property who were originally solicited, and two persons owning property adjacent to the shorefront lots. The three solicited property owners who refused to contribute owned three of the four properties on Cedar Island. The four lots on Cedar Island faced Long Island Sound as well as the narrow waterway to the rear that was dredged (Little Harbor Sound), so that the owners thereof did not require the dredging performed by the association in order to enable them to engage in boating and swimming from their property.

One of the contributing property owners remitted his 1959 payment accompanied by the following memorandum: "Sorry this is so late, but I was waiting to see what would be done adjacent to our property." Two of the contributors, Robert S. MacCallum and Leo Sternberg, refused to pay the full amount requested of them by the association. MacCallum purchased a piece of shorefront property from one of the original subscribers to the association. He paid only $400, whereas the previous owner had agreed to pay $940. Sternberg did not sign the original subscription agreement and was not even listed thereon as he did not own shorefront property. He had only a right-of-way through his neighbor's property and was not allowed to keep a boat there. As a matter of good will he paid $250 to the association, but because of the above factors he refused to pay $454, the amount which the association felt he should pay.

The only other money received by the association was $1,200 from the Village of Larchmont. On June 10, 1959, the association received a bill from Dandry Bros. for $1,200 for the rental of a bulldozer for 12 days at $100 per day, which was used in connection with the proposed ball field in Flint Park. On July 2, 1959, the association presented a "Claim For Payment" to the Village of Larchmont for $1,200 with the following explanation:

| Quantity | Unit | Commodity | Unit price | Total amount |
|---|---|---|---|---|
| 12—complete working days | | Excavating work by Dandry Bros., New Rochelle with bull dozer for basin in Flint Park to provide fill for new baseball field and a basin to receive dredged material from Larchmont Committee for Providing A Storm Haven for Small Craft, Inc., as per resolution of the Board of Trustees of December 15, 1958: | $100.00 | $1200.00 |

The claim was signed on behalf of the association by William Eipel as a director thereof, and he made a certification in the claim to the effect that:

all of the statements on such claim are true; that the services and disbursements charged therein have been in fact rendered or paid; that the property or ma-

terials charged therein have been in fact delivered, and that no part thereof has been paid or satisfied.

It was approved by the board of trustees and $1,200 was paid to the association. On October 10, 1959, the association paid $1,000 to Dandry Bros., and on September 20, 1960, paid the remaining $200 balance.

William Eipel was a licensed engineer, and had made the engineering surveys upon which the determination was made of where and how much to dredge. In keeping track of the dredging operation as it was being performed, he prepared a map showing the daily progress of the project, listing the number of yards of material dredged each week, the property owners "benefitted" in each area dredged, and in a number of instances the amount of money to be contributed by such property owners.

Petitioner attempted on behalf of the association to have it declared exempt from Federal income tax as a charitable corporation. This was done with the advice and guidance of another attorney upon the understanding that if the exemption was obtained, each contributor to the association would pay that attorney a fee equal to 10 percent of the amount of his respective contribution. Petitioner attempted to collect these amounts for the other attorney from each contributor.

In support of its application for exemption the association claimed that it was "organized and operated exclusively for public charitable purposes because the public is the beneficiary of all of our efforts." It also asserted that there was no solicitation of contributions other than at public meetings called by the village of Larchmont for the purpose of discussing the project, at which times persons attending the meetings were informed that the association would accept any contribution they cared to make. The association further stated that it asked the board of trustees of the Village of Larchmont to contribute as much as they deemed appropriate without any written agreement and without any suggestion by the association as to how much it should be.

These representations were misleading and inaccurate. They failed to disclose adequately the extent to which the project was to be undertaken for the benefit of those who were expected to contribute funds to defray the major portion of the cost of the project. Moreover, at least several meetings were held by the shorefront property owners to discuss the dredging operation and the problem of collecting funds to carry it out, and solicitations were in fact made privately or at closed gatherings. Contributions thus sought were computed according to a fixed formula. And, as heretofore stated, the Village of Larchmont "contributed" $1,200 to the association only after receiving a "Claim For Payment" in that amount from the association.

On March 30, 1960, subsequent to receipt of the last payment from

a contributor, the association was advised by the Internal Revenue Service that it would be considered a tax-exempt organization. This tax-exempt status was retroactively revoked on October 26, 1964, upon a finding by the Internal Revenue Service that the association had not been organized and operated exclusively for public and charitable purposes as contemplated by section 501(c)(3) of the 1954 Code.

### OPINION

RAUM, *Judge:* In 1959, petitioners paid $375 to the Larchmont Committee for Contributing to the Development of a Storm Haven for Small Craft, Inc. (the association), a corporation which was organized for the purpose of dredging certain waterways in Larchmont Harbor. In order to be allowable as a deduction for income tax purposes that payment must come within the definition of a "charitable contribution" provided in section 170 of the 1954 Code.[2] That definition requires that we look to the nature of the organization to which the payment was made, and determine whether it qualifies as a charitable corporation.

On March 30, 1960, the association was ruled an exempt charitable corporation for Federal income tax purposes pursuant to section 501 of the 1954 Code.[3] However, that ruling was later retroactively re-

---

[2] SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS.

(a) ALLOWANCE OF DEDUCTIONS.—

(1) GENERAL RULE.—There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)), payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary or his delegate.

\* \* \* \* \* \*

(c) CHARITABLE CONTRIBUTION DEFINED.—For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of—

\* \* \* \* \* \* \*

(2) A corporation, trust, or community chest, fund, or foundation—

(A) created or organized in the United States or in any possession thereof, or under the law of the United States, any State or Territory, the District of Columbia, or any possession of the United States;

(B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes or for the prevention of cruelty to children or animals;

(C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; \* \* \*

[3] SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.

(a) EXEMPTION FROM TAXATION.—An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502, 503, 504.

\* \* \* \* \* \* \*

(c) LIST OF EXEMPT ORGANIZATIONS.—The following organizations are referred to in subsection (a):

\* \* \* \* \* \* \*

(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

voked by the Commissioner, on the ground that the association had not been organized for public and charitable purposes. Such action by the Commissioner was proper, sec. 7805(b), I.R.C. of 1954;[4] *Automobile Club of Michigan* v. *Commissioner*, 353 U.S. 180; *Fruehauf Trailer Co.* v. *Commissioner*, 356 F. 2d 975 (C.A. 6), affirming 42 T.C. 83, particularly in view of the incomplete and in part erroneous information submitted on behalf of the association to obtain the ruling on its tax-exempt status. *Stevens Bros. Foundation, Inc.* v. *Commissioner*, 324 F. 2d 633, 641–642 (C.A. 8), affirming 39 T.C. 93, 106–108; *Wolinsky* v. *United States*, 271 F. 2d 865, 868 (C.A. 2). But cf. *Lesavoy Foundation* v. *Commissioner*, 238 F. 2d 589 (C.A. 3), reversing 25 T.C. 924.

It is clear from the record that the principal, if not the sole purpose, of the association was to dredge the waterways involved for the benefit of those persons owning property or living on the shores thereof. Any objective to benefit the general public by providing a storm haven for small craft, if it existed at all, was a secondary one.

These waterways were not usable for boating or swimming for several hours at low tide since at such times much of the area came out of the water. Also, the resulting exposed mud gave off an offensive odor. While the elimination of these conditions may have been good or beneficial in a general sense, the persons owning property or living on the shoreline were the major beneficiaries of the dredging operation. Their properties were most affected by the offensive odor, and they were the only ones who could legally launch boats there or readily use the area for swimming since no facilities were available to the public.

The association was organized and operated by the shorefront property owners, and they were the persons who contributed to the association. The only two people contributing to the association who did not own shorefront property, owned lots adjacent to such property. Three shorefront property owners who refused to contribute to the association owned three of four lots (on Cedar Island) which were situated so that they did not require the dredging to enable the occupants to enjoy the pleasures of boating and swimming from their backyards.

The method of ascertaining the contribution each shorefront property owner was to make, was directly related to the benefit obtained from the dredging by each owner. Each owner was told how much to pay based on whether the property he owned was shorefront property, the assessed value of the property, the number of feet of waterfront of the property, and the total number of square feet in the prop-

---

[4] SEC. 7805. RULES AND REGULATIONS.

(b) RETROACTIVITY OF REGULATIONS OR RULINGS.—The Secretary or his delegate may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect.

erty. This method was used in an attempt to impose the burden in some equitable fashion on those who would benefit from the project.

Aside from the contributions from the property owners, the only payment received by the association was $1,200 from the village of Larchmont. This was paid to the association only after a "Claim For Payment" was filed by it setting forth work which had been done by Dandry Bros. in bulldozing Flint Park at a cost of $1,200. This amount plainly was not a contribution by the village; it simply represented payment by it for the work done by Dandry Bros. in Flint Park.

Petitioners might urge that another possible aspect of the charitable nature of the association was its donation of the dredged material to the Village of Larchmont as fill for a ball field, thereby saving the village about $15,000. However, the facts show that the association had a problem of what to do with the dredged material, and it was only after considerable discussion that the association was able to prevail upon the village to accept this material as fill. Had the village not permitted the material to be deposited on the Flint Park land and had no other nearby site been found available to pump it to, it would have been necessary to have had the dredged material taken away by barges at about six times the original projected cost.

Considering the entire record before us, it is clear that the association was organized and operated primarily for the benefit of those persons contributing to it; it certainly was not "organized and operated *exclusively* for * * * charitable * * * purposes" (emphasis supplied), as required by section 501(c)(3), and payments to it are not allowable as "charitable contributions" as defined in section 170(c)(2).[5]

*Decision will be entered for the respondent.*

---

[5] Since the corporation cannot in any sense of the word be considered "charitable," as that word is used in secs. 170 and 501, it is not necessary to consider whether there is here involved a "prohibited transaction" within the meaning of sec. 503 in respect of an otherwise tax-exempt charitable corporation.

