SONORA COMMUNITY HOSPITAL, A CALIFORNIA CORPORATION, PETI-
TIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 420–64.    Filed July 26, 1966.

*Alvin L. Anderson,* for the petitioner.
*Leo A. McLaughlin,* for the respondent.

The Commissioner determined the following deficiencies in peti-
tioner's income tax.

| TYE Mar. 31— | *Deficiency* |
|---|---|
| 1959 | $24, 773. 16 |
| 1960 | 3, 538. 05 |
| 1961 | 7, 480. 59 |

At issue is whether petitioner qualified as an exempt charitable organ-
ization under the provisions of section 501 of the 1954 Code.

### FINDINGS OF FACT

The stipulations of fact together with accompanying exhibits filed
by the parties are incorporated herein by this reference.

Petitioner is a corporation organized on or about March 21, 1958,
under the laws of the State of California.   During the periods here at
issue, petitioner was engaged in the business of owning and operating a
42-bed general hospital at One South Forest Road, Sonora, Calif.   For
Federal income tax purposes, petitioner filed a Return of Organization
Exempt From Income Tax (Form 990–A) for each of its fiscal years
ending March 31, 1959, 1960, and 1961, with the district director of
internal revenue, San Francisco, Calif.

In 1950, Ben R. Boice, a medical doctor, established a medical prac-
tice in Sonora, a town of about 2,500 inhabitants which serves a county
(Tuolumne) having a population of about 18,000.   He became a mem-
ber of the staff at the Columbia Way Hospital in Sonora.   There were
then two other hospitals in the town, the Sonora Hospital and the
Tuolumne County Hospital.   Dr. Boice had a "sort of a courtesy staff
membership" at the Sonora Hospital, but none at the county hospital.
The Sonora Hospital was housed in a small, old building, having 13
beds.   It was located on Washington Street, the main street in Sonora.
Its owner, Dr. Wrigley, died around 1950, and it was thereafter closed
as a hospital.   Dr. Boice purchased the property from Dr. Wrigley's
widow in 1953 for use as an office.

Paul L. Anspach is a medical doctor who had come to Sonora shortly before 1954. In January 1954, he and Dr. Boice formed a partnership to practice medicine in Sonora. The partnership offices were located on the main floor of the old Sonora Hospital building which, as noted above, had been purchased by Dr. Boice; the upper floor was shut off and the bottom floor was used for storage.

At sometime prior to 1956, Drs. Boice and Anspach began to have difficulties with the Columbia Way Hospital and they were "virtually tossed out of" that hospital. In order to continue to practice medicine in Sonora it became imperative for them to obtain some other hospital connection. Accordingly, in January 1956 they reopened and began to operate the old Sonora Hospital. They increased its capacity to 21 beds. It was their intention at that time to build a more adequate and modern hospital facility in Sonora. The State of California issued a temporary 1-year permit to Drs. Boice and Anspach to reopen and operate the old Sonora Hospital, pending completion of a new hospital, and they operated the hospital as a partnership under the name "Sonora Hospital."

Drs. Boice and Anspach attempted unsuccessfully to interest various persons and organizations in undertaking the building, financing, and operation of a new community hospital in Sonora. However, they were able to obtain on their own behalf a loan of $200,000 from the Small Business Administration of the United States and with this money, and additional sums advanced by them as individuals, they purchased a parcel of realty located at One South Forest Road in Sonora and constructed a 42-bed hospital thereon. This hospital was completed on July 7, 1957.

Upon completion of the new hospital at One South Forest Road, Drs. Boice and Anspach closed their hospital operation at Washington Street and moved it to the new location. However, at that time they continued to maintain their office in the old Sonora Hospital building. In 1959, they placed a new building adjacent to the hospital building at One South Forest Road and moved their offices into this new building.

On January 9, 1956, at about the time the old Sonora Hospital was reopened, Drs. Boice and Anspach entered into an agreement with two brothers, Jack and James C. Rucker, both of whom are registered "technologists," whereby the Ruckers were to operate laboratory and X-ray facilities at the Sonora Hospital or such other hospitals as might be established by Drs. Boice and Anspach during the term of the agreement, which was to be 10 years.

The January 9, 1956, agreement provided that the Ruckers were to establish, equip, staff, and maintain laboratory and X-ray facilities in quarters provided in the hospital by Drs. Boice and Anspach. Further,

Drs. Boice and Anspach were to make use of the laboratory and X-ray facilities so established exclusively for all laboratory and X-ray work required by them in their practice or in connection with the operation of the hospital. Also, Drs. Boice and Anspach were to bill and collect all charges in respect of laboratory and X-ray work on in-patients and remit these collections to the Ruckers. Work on out-patients was to be billed directly by the Ruckers. In consideration for the above, the Ruckers agreed to pay to Drs. Boice and Anspach one-third of the total gross receipts derived from the operation of the laboratory and X-ray departments. The doctors were not required to perform any services under the terms of the agreement with respect to the operation of either the laboratory or the X-ray department.

Pursuant to the agreement of January 9, 1956, the Ruckers operated the two departments, namely, the laboratory and the X-ray facility, as a separate trade or business in partnership form under the name of Sonora Hospital Laboratory and X-ray Co. The services thus rendered consisted of the operation of a general X-ray department and a clinical laboratory; the work of the laboratory involved making blood counts, cholesterol counts, urinalyses, etc. However, neither the Sonora Hospital Laboratory and X-ray Co., nor Drs. Boice and Anspach made pathological examinations of tissue; such work was sent out to a pathologist.

Upon moving into the new hospital on July 7, 1957, Drs. Boice and Anspach assigned approximately 1,000 square feet of floor space in the new building to the Ruckers for installation of their laboratory and X-ray equipment. The Ruckers moved into the new building and continued performing in accordance with the January 9, 1956, agreement. At this time, the Ruckers completely reequipped the laboratory and X-ray facilities at their own expense.

On or about March 21, 1958, Drs. Boice and Anspach caused the incorporation of petitioner under the name of Boice-Anspach Foundation, pursuant to the General Nonprofit Corporation Law, part 1 of division 2 of title 1 of the Corporation Code of the State of California. Subsequently, on or about June 11, 1958, petitioner changed its name to Sonora Community Hospital.

On or about March 31, 1958, Drs. Boice and Anspach sold their partnership interests in the hospital located at One South Forest Road to petitioner for a net consideration of approximately $251,180. In consideration for these assets, petitioner gave Drs. Boice and Anspach 20 promissory notes bearing interest at 6 percent and payable over a period of years beginning in 1968.

Subsequent to the transfer of the hospital to petitioner the Ruckers continued to operate the laboratory and X-ray departments in the same fashion as when the doctors owned the hospital. Up until about May 26, 1958, they continued to remit one-third of the gross receipts

derived from the operation of these facilities directly to Drs. Boice and Anspach. On or about May 26, 1958, Drs. Boice and Anspach directed the Ruckers to pay the one-third share of the gross receipts to Leasing Co. of Sonora, a corporation wholly owned by these doctors. They had caused it to be incorporated about December 2, 1957, and were its sole stockholders at all times pertinent.

The Ruckers complied with this directive. Leasing Co. of Sonora did not rent any equipment or property to either petitioner or Sonora Hospital Laboratory and X-ray Co. About two-thirds of all the fees collected were attributable to the operation of the X-ray department and the remaining one-third to the laboratory.

In October 1959, Drs. Boice and Anspach directed the Ruckers to pay petitioner $100 per month out of their one-third share of the gross receipts derived from the laboratory and X-ray facilities and to continue to pay the balance of that share to Leasing Co. of Sonora. In May 1960, Drs. Boice and Anspach directed the Ruckers to pay the entire one-third share to petitioner.

The Sonora Hospital Laboratory and X-Ray Co. billings and payments for both out-patients and in-patients for the calendar years 1958, 1959, 1960, and the period January 1, 1961, through September 30, 1961, were as follows:

| | Billings | | Payments | |
|---|---|---|---|---|
| | Out-patients | In-patients | Out-patients | In-patients |
| 1958 | $37,482.84 | $47,903.63 | $35,139.24 | $43,237.15 |
| 1959 | 39,308.72 | 51,121.66 | 36,453.46 | 38,382.98 |
| 1960 | 48,885.60 | 52,747.75 | 43,114.36 | 42,580.19 |
| 1/1/61–9/30/61 | 38,382.98 | 33,158.22 | 34,374.72 | 42,795.99 |

During petitioner's fiscal years ended March 31, 1959, 1960, and 1961, the Ruckers paid $25,121.07, $23,135.82, and $1,898.32, respectively, to Leasing Co. of Sonora as directed by Drs. Boice and Anspach. Leasing Co. of Sonora used these moneys to make investments not related in any way to petitioner's operations.

During the years here in issue, the State of California had no licensing provisions concerning X-ray technicians or the operation of X-ray equipment, and the Ruckers were empowered under California law to operate and in fact did operate the X-ray department in the hospital without any supervision by a physician. Although an X-ray department in a hospital is usually under the supervision of a radiologist (a physician who specializes in the interpretation of X-ray films and in the performance of fluoroscopic examinations) or other qualified medical doctor, neither Dr. Boice nor Dr. Anspach in fact supervised that department. Neither was a radiologist. Each would per-

form fluoroscopic examinations of his own patients and each would examine X-ray films taken by the Ruckers of his own patients, but such examinations were merely those which any physician might make in respect of his own patients who were sent to the X-ray department, rather than those which would be made by the director or other qualified supervising physician in the X-ray department. In 1961, petitioner hired a qualified radiologist, Dr. Robert Powell, to take charge of the radiological services. He performed fluoroscopy work and reviewed X-rays taken in his department, submitting a written report to the attending physician. His work in that respect differed markedly from the examinations that Drs. Boice and Anspach might make in respect of their own patients or in connection with an occasional case in which some other physician might solicit their opinion in respect of a particular patient. Neither Dr. Boice nor Dr. Anspach rendered compensable services in the X-ray department as director or otherwise; any services performed by either of them in relation to X-rays were those that might be rendered by any practicing physician unconnected with the operation of the X-ray department.

The situation in respect of the laboratory was somewhat different from that of the X-ray department. California law required that the laboratory be "under the direct and responsible supervision and direction of" a licensed clinical laboratory bioanalyst or a licensed physician and surgeon. Sec. 1284, Cal. Bus. & Prof. Code. Since neither of the Ruckers qualified under either of these categories, Dr. Boice signed the required application for the license to operate the laboratory, and became in name the director of the laboratory. Dr. Boice continued in this capacity from January 9, 1956, until sometime in 1959. However, all work in the laboratory was done by the Ruckers or under their supervision.

Under section 1285 of the California Business and Professions Code it "is unlawful for a licensed * * * physician and surgeon to serve only as the nominal director or supervisor of a clinical laboratory." Although reports issued by the laboratory were signed in Dr. Boice's name, there is no convincing evidence in this record that he actually supervised or directed the operation of the laboratory to any appreciable extent, if at all. Nor does it appear that Dr. Anspach ever acted as director of the laboratory either in fact or nominally. To the extent that Dr. Boice might have questioned the results of any tests performed by the laboratory in respect of any of his patients and required the tests to be repeated, the situation was no different from that of any physician who might have sent his patients to the laboratory for tests; such action by him did not in any manner represent the supervision or direction of the operation of the laboratory. In 1959, Dr. Theodore C. Howard, an employee of Drs. Boice and Anspach,

signed the license application as director of the laboratory. Although the medical director of a clinical laboratory is often a physician specializing in pathology, and may receive between 30 and 40 percent of the gross receipts of the laboratory, it does not appear that either Dr. Boice or Dr. Howard had any special qualifications as a pathologist or that Dr. Howard was in fact any more active than Dr. Boice in the actual operation or supervision of the laboratory.

There were several other doctors associated with Drs. Boice and Anspach in the practice of medicine; they all occupied the same offices and all of them are sometimes referred to herein in the aggregate as the "medical group." There were about 10 doctors in Sonora when petitioner acquired the hospital from Drs. Boice and Anspach. Seven of them were on the hospital staff, and 4 of the 7 were members of the medical group. At the time of trial herein (January 1966) there were about 15 doctors in Sonora, 11 of whom were on the hospital staff and 5 in the medical group. About 90 percent of petitioner's patients were patients of members of the medical group.

Dr. Anspach's wife, Helen, is a physician, and during the tax years served as administrator of the hospital without compensation. Drs. Boice and Anspach also performed various administrative services in the operation of the hospital for which they were not compensated.

Petitioner had no endowment and no source of income other than the fees received for services rendered to patients. It had no written rules or regulations regarding the admission of charity patients, and it did not ordinarily admit charity patients. Its practice was to refer charity patients to the County Hospital, and on occasion when a charity patient was admitted in an emergency it would have him transferred when circumstances permitted to the County Hospital. It did admit and retain charity patients in a very small number of instances. The total amount of free care furnished was less than 1 percent of paid care. In some instances patients were admitted with the understanding that they would pay less than the full regular charges—usually to the extent that hospital insurance or some other similar plan covered the services involved. Unpaid patient accounts were turned over to a collection agency, including amounts part-pay patients had agreed to pay. During the period March 1959 to January 1, 1961, petitioner turned over $34,721.72 of unpaid patient accounts for collection.

On or about August 14, 1959, petitioner filed an exemption application with the Commissioner, requesting exemption from Federal income taxes as a corporation organized and operated exclusively for charitable purposes within the meaning of section 501(a) and 501 (c)(3) of the Internal Revenue Code of 1954.

On this application form, and in its subsequent correspondence with the Commissioner concerning the application, petitioner made no mention of the participation by Drs. Boice and Anspach in the gross

receipts derived from the laboratory and X-ray operations conducted on its premises.

On February 29, 1960, the Commissioner ruled that petitioner was exempt as an organization described in section 501(c)(3) of the Internal Revenue Code of 1954 on the basis that petitioner had shown that it was organized and operated exclusively for charitable purposes. This ruling was made effective beginning April 1, 1958. On December 26, 1962, the Commissioner revoked his ruling of February 29, 1960.

In 1961, after the last of the 3 fiscal tax years involved herein, the articles of incorporation and bylaws of petitioner were completely amended and it became an integrated institution wholly operated by the Seventh Day Adventist Church. In connection with the absorption of the hospital by the church, Drs. Boice and Anspach forgave payment on the notes (including all accrued interest) which they had received upon transferring the hospital assets to petitioner.

OPINION

RAUM, *Judge:* The sole question before us is whether petitioner was exempt from tax as a corporation "organized and operated exclusively for * * * charitable * * * purposes, * * * no part of the net earnings of which inures to the benefit of any private * * * individual * * *." I.R.C. 1954, sec. 501 (a) and (c)(3).[1] A ruling by the Commissioner in favor of petitioner was revoked upon a fuller development of the relevant facts. If the Commissioner's present position as to the inapplicability of the exemption is correct, there is no question that the retroactive revocation of the earlier ruling was proper, *Automobile Club of Michigan* v. *Commissioner*, 353 U.S. 180, 183–185; *Benedict Ginsberg*, 46 T.C. 47, 54–55, and petitioner does not contend otherwise. We hold that petitioner was not "operated exclusively for * * * charitable * * * purposes," and the statutory exemption is inapplicable.

The mere fact that petitioner maintained a hospital does not in and of itself justify the conclusion that it was operated exclusively for charitable purposes. While the diagnosis and cure of disease are in-

---

[1] SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.

(a) EXEMPTION FROM TAXATION.—An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502, 503, or 504.

* * * * * * *

(c) LIST OF EXEMPT ORGANIZATIONS.—The following organizations are referred to in subsection (a) :

* * * * * * *

(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, * * *

deed purposes that may furnish the foundation for characterizing an activity as "charitable," something more is required. See Rev. Rul. 56–185, 1956–1 C.B. 202. And in this case, there is no something more to any significant extent. To the contrary, there is no evidence that petitioner ever held itself out to the public even in a limited way as a charitable institution; it was operated to a substantial degree for the benefit of its founding doctors, who together with their associates were the source of 90 percent of the patients treated at the hospital, and who through private arrangements with the Ruckers were the beneficiaries of one-third of the gross receipts of the X-ray department and clinical laboratory which the Ruckers operated at the hospital; and the amount of free care rendered by petitioner was on a *de minimis* level, being less than 1 percent of paid care, cf. *Lorain Avenue Clinic*, 31 T.C. 141, 161.

We do not single out any one of the foregoing considerations as the crucial factor, nor is it necessary to make any precise ruling as to whether the arrangement with the Ruckers constituted in substance a diversion of petitioner's income to the founding doctors, for, in our opinion, these considerations in the aggregate clearly establish that petitioner was not operated exclusively for "charitable" purposes within the requirements of the statute.

Of course, a "charitable" hospital may impose charges or fees for services rendered, and indeed its charity record may be comparatively low depending upon all the facts, cf. *Commissioner* v. *Battle Creek, Inc.*, 126 F. 2d 405 (C.A. 5) ; Rev. Rul. 56–185, *supra*, but a serious question is raised where its charitable operation is virtually inconsequential. Cf. *Lorain Avenue Clinic, supra*. The latter circumstance takes on added significance in the light of the other facts of record applicable to petitioner during the tax years, disclosing that the hospital was operated to a considerable extent for the benefit of the founding doctors, including their arrangement for sharing in the fees of the X-ray department and clinical laboratory.

It is no answer to say that the gross receipts of these facilities were paid to the Ruckers and were technically never part of the hospital's income. The point is that when Drs. Boice and Anspach reopened the old Sonora Hospital in 1956 they entered into a highly profitable contract with the Ruckers, and, after subsequently allocating 1,000 square feet of space to the Ruckers in the new hospital, caused petitioner to acquiesce in the arrangement so that one-third of the gross receipts of the two departments in question would still be paid over to them by the Ruckers.

Petitioner attempts to justify the arrangement on the ground that the one-third gross receipts thus paid over were for services rendered. The answer, however, is simple, namely, that the contract between Drs.

Boice and Anspach and the Ruckers did not call for the performance of any services by the doctors, and in any event, we do not believe that any services of consequence were rendered calling for payments in the amounts involved. Certainly, in respect of the X-ray department, which accounted for about two-thirds of the receipts, we cannot find on this record that prior to the advent of Dr. Powell in 1961 either Dr. Boice or anyone associated with him rendered any services of consequence to that department. We do not share the dim view taken by petitioner's counsel of the testimony of James C. Rucker in this connection; we found it strong and credible. And even as to the clinical laboratory, the evidence convincingly indicates that Dr. Boice, and later Dr. Howard, served merely as the nominal director without any actual supervision over its activities. Although the burden was upon petitioner, the questioning of Dr. Boice in an effort to pinpoint just what he did in relation to the laboratory brought forth no clear answers showing any real supervision over the laboratory.

Petitioner has made various other contentions which we have carefully considered and found unpersuasive. Whatever may be said in respect of any subsequent period, we cannot find on this record that petitioner during the tax years was operated exclusively for charitable purposes.

*Decision will be entered under Rule 50.*