**HARDING HOSPITAL, INC., Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

Civ. A. No. 69–383.

United States District Court,
S. D. Ohio, E. D.

April 27, 1973.

Herbert R. Brown, Trial Atty., Vorys, Sater, Seymour & Pease, Columbus, Ohio; Byron E. Ford and Richard R. Stedman, Columbus, Ohio, of counsel, for plaintiff.

Scott P. Crampton, Asst. Atty. Gen., Thomas R. Jones, Trial Atty., Dept. of Justice, Donald R. Anderson, Dept. of Justice, William W. Milligan, U. S. Atty., for defendant.

OPINION AND ORDER

KINNEARY, Chief Judge.

This matter is before the Court for decision after a hearing on the merits. The Court shall decide the issues presented herein upon consideration of the pleadings, the stipulations of the parties and the evidence adduced at the trial.[1]

This action is a civil tax refund suit commenced by the plaintiff, Harding Hospital, Inc., against the United States of America to recover the sum of $141,730.00. The Court has jurisdiction over the action under the provisions of 28 U.S.C. § 1346 and 26 U.S.C. § 7422.

The plaintiff has paid the government $141,730.00 as income tax for the tax years 1966 through 1968. The plaintiff claims that it was entitled to exemption

---

1. The parties have also submitted both pre and post trial briefs.

status under 26 U.S.C. § 501(c)(3). The plaintiff, therefore, maintains that the taxes paid were erroneously and illegally assessed and collected.

Pursuant to the mandate of Rule 52, F.R.Civ.P., the Court makes the following findings of fact and conclusions of law.

### Findings of Fact [2]

1. The plaintiff Harding Hospital, Inc. [hereinafter referred to at times as the Hospital] is an Ohio corporation organized under Ohio law as a corporation not for profit. The Hospital's address is 445 East Granville Road, Worthington, Ohio.

2. On or about May 2, 1969 the Hospital filed its federal income tax returns for the tax years 1966 and 1967. The returns reported tax due in the amounts of $33,400.00 for 1966 and $35,025.00 for 1967. On or about July 30, 1969 the Hospital filed its federal income tax returns for the tax year 1968 reporting tax due in the amount of $73,278.00. The Hospital has paid all of the taxes due for these three years.

3. On or about August 12, 1969 the Hospital filed claims for refund for the taxes paid during each of the years 1966, 1967 and 1968. The Internal Revenue Service denied the plaintiff's claims for refund on or about September 4, 1969. This action was commenced on December 12, 1969.

4. The Internal Revenue Service had made a tentative ruling in 1962 that the Hospital was exempted from paying federal income taxes under the provisions of § 501(c)(3) of the Internal Revenue Code of 1954, 26 U.S.C. § 501(c)(3). The Internal Revenue Service, by letter of December 1, 1965, indicated that it proposed to revoke the tentative exemption ruling of 1962.[3] On November 14, 1968 the District Director of Internal Revenue Service issued a determination letter revoking the tentative ruling of 1962.[4] The Hospital was declared not to be exempt and was informed that it was required to file federal income tax returns. The Internal Revenue Service determined that since the Hospital had relied upon the 1962 ruling the revocation of the exemption should not be applied prior to January 1, 1966.

5. The plaintiff is the successor to the Columbus Sanitarium Company which was a corporation for profit incorporated in 1918 in Columbus, Ohio.[5] In 1920 the Hospital moved to its present location in Worthington, Ohio and in 1946 its name was changed to Harding Sanitarium, Inc. In December, 1961 the articles of incorporation of the Hospital were amended to give the Hospital its present name and to provide that it operate as a non-profit corporation.[6]

6. Dr. George T. Harding, Jr. founded the original institution in 1918. The Harding family was the moving force and the guiding direction behind the growth and evolution of the Hospital from the Columbus Sanitarium of 1918 to the Harding Sanitarium, Inc. of 1961. The Harding family owned or controlled a great part of the Hospital's assets. This is demonstrable from the fact that at the time of the reorganization of the Hospital in December, 1961 the immediate members of the Harding family owned the lionshare of the Hospital's outstanding stock.[7]

7. Under the terms of the reorganization of the Hospital to a corporation

2. The findings of fact represent a collection of the relevant and material facts as stipulated to by the parties and as appeared through the evidence at trial. The parties have filed two stipulations of fact which have been made part of the record.

3. See plaintiff's exhibit 11.

4. See plaintiff's exhibit 12.

5. See plaintiff's exhibit 1.

6. Id.

7. See finding of fact number 9, infra.

not for profit under the laws of Ohio, the shareholders exchanged their shares of the corporation for twenty year subordinated promissory notes bearing interest at the rate of four percent based upon an agreed exchange rate of $3,000.00 per share. The exchange rate was based upon the book value of the shares adjusted on the basis of independent appraisals to reflect the current value of land, buildings and equipment. The adjusted book value thus determined was $3,796.00 per share which was rounded downward to $3,000.00 per share by agreement of the parties to that transaction.

8. The value assigned to the shares for the purpose of the exchange was not in excess of the fair market value of such shares.

9. The shareholders at the time of the exchange and the notes they received were as follows: [8]

| Shareholders | Shares Held Before Exchange | Notes Received In Exchange |
|---|---|---|
| The Worthington Seventh Day Adventist Church | 11 | $ 33,000.00 |
| George T. Harding, III | 122 | 366,000.00 |
| Mary V. Harding | 24 | 72,000.00 |
| Harrison S. Evans | 66 | 198,000.00 |
| Ruth H. Evans | 47 | 141,000.00 |
| Warren G. Harding, II | 48 | 144,000.00 |
| Frances K. Harding | 3 | 9,000.00 |
| Charles W. Harding | 26 | 78,000.00 |
| George T. Harding, IV | 2 | 6,000.00 |
| James L. Hagle | 2 | 6,000.00 |
| Herndon P. Harding | 1 | 3,000.00 |
| Florence Keller | 6 | 18,000.00 |

10. The Harding-Evans Medical Associates, Inc. [hereinafter the Associates] was during the years in suit an Ohio corporation. It was incorporated in Columbus, Ohio in 1962. Its stockholders and the stocks held by each during the years in suit were as follows:

| Shareholders | Stock Held For | | |
|---|---|---|---|
| | 1966 | 1967 | 1968 |
| George T. Harding, III | 20 | 20 | 20 |
| Charles W. Harding | 19 | 20 | 20 |
| Donald Burk | 17 | 18 | 19 |
| George T. Harding, IV | 17 | 18 | 19 |
| Herndon P. Harding | 13 | 14 | 15 |
| Richard G. Griffin | 2 | 3 | 4 |

11. For approximately eight years prior to 1962 the Associates existed as a medical partnership composed of Dr. George T. Harding, III, Herndon P. Harding, Charles W. Harding, Dr. Donald Burk, Clarence Carnahan, Harrison S. Evans and George T. Harding IV.

12. In 1962 the Hospital entered into a written agreement with the Associates.[9] The Associates agreed to provide adequate supervision over all patients in the Hospital twenty-four hours each day, seven days per week, to program and supervise occupational and recreational therapies and other group activities, to consult with other physicians who have patients in the Hospital, and to render emergency service and treatment to any patient or employee of the Hospital who requires such service, without charge.

13. The Associates further agreed to provide, in cooperation with The Harding-Evans Foundation, the teaching staff, plan the curriculum and supervise the training of the interns, residents in psychiatry, psychologists, nurses, occupational therapists, and psychiatric social workers accepted by the Hospital for such training.

8. Some of the note holders have forgiven the Hospital's indebtedness outright. There does not appear to be any agreement or schedule whereby the notes would be redeemed by the Hospital. Dr. Harding has testified, in this respect, as follows:

Q. Has the hospital redeemed these notes across the board, that is to say, have all shareholders been paid for certain of their notes?

A. It's largely held by members of the family so that there has been no disagreement about it. When it was available, it was paid. When it wasn't, it hasn't been paid. I mean we don't get payments of so much regularly although we are attempting so that it would be liquidated. Trial transcript, page 239.

9. See defendant's exhibit F.

14. The Hospital agreed to pay the Associates $25,000.00 for the above services.

15. The Hospital agreed to make its facilities available for patients of Harding-Evans Medical Associates, Inc., to provide furnished office space for the physicians, their secretaries and auxiliary professional personnel employed by Harding-Evans Medical Associates, Inc., library facilities, dictating equipment and telephone service, and to handle the billing of patients of Harding-Evans Medical Associates, Inc. Harding-Evans Medical Associates, Inc. agreed to pay to Harding Hospital, Inc. the sum of $1,000.00 per month as rental for such facilities, equipment and service.

16. A second agreement was entered into between the Hospital and the Associates on October 12, 1965.[10] The Associates again agreed to provide competent supervision over all patients in the Hospital twenty-four hours each day, seven days per week, to program and supervise occupational and recreational therapies and other group activities, to consult with other physicians who have patients in the Hospital, and to render emergency service and treatment to any patients or employees of the Hospital who require such service, without charge.

17. The Associates further agreed to provide the teaching staff, plan the curriculum and supervise the training of the interns, residents in psychiatry, psychologists, nurses, occupational therapists, and psychiatric social workers accepted by the Hospital for such training.

18. The Hospital agreed to make its facilities available for patients of Harding-Evans Medical Associates, Inc., to provide furnished office space for the physicians, their secretaries and auxiliary professional personnel employed by Harding-Evans Medical Associates, Inc., library facilities, dictating equipment and telephone service, and to handle the billing of patients of Harding-Evans Medical Associates, Inc. Harding-Evans Medical Associates, Inc. agreed to pay to Harding Hospital, Inc. the sum of $35,000.00 per year as rental for such facilities, equipment and services.

19. The Associates were to again receive $25,000.00 per year from the Hospital for their services. The agreement was to apply retroactively from January 19, 1965.

20. A third agreement was entered into between the Hospital and the Associates on October 29, 1968.[11] The agreement was to have retroactive effect from July of 1968 and basically reiterated the terms of the 1965 agreement. The major variance being that the sum paid to the Hospital by the Associates was reduced to $15,000.00 per year and the amount paid by the Hospital to the Associates was increased to $35,000.00 per year.

21. All three of the agreements contained a clause to the effect that the Associates would provide medical service to the Hospital's indigent patients without charge or at a reduced rate.[12]

22. The plaintiff is a psychiatric hospital. From its inception in 1918 the reason d'etre of the Hospital was the medical treatment of nervous and mental illnesses of all varieties. The Hospital utilizes a method of treatment referred to in medical circles as milieu therapy. Milieu therapy, according to many experts, was developed at the Menninger Hospital in Topeka, Kansas in the 1930's.

23. Milieu therapy contemplates around the clock supervision and treatment of the mentally ill patient. The patient's entire environment is con-

10. See defendant's exhibit D.

11. See defendant's exhibit E.

12. James Hagle signed all three of the agreements for the Hospital as the Hospital's secretary. Hagle served as the Hospital's administrator for many years, including those at suit, and received a salary from the Hospital. Hagle was also the secretary, treasurer and the accountant for the Associates during 1966, 1967 and 1968. Dr. Harding, Jr. signed the agreements for the Associates as their president.

trolled and structured toward rehabilitation. Thus, the patient's day is completely planned with activities according to the individual's needs. Milieu therapy, or environmental treatment, therefore, is contrasted with the treatment administered in a general hospital where the patient is maintained in a bed while specific medical treatments are performed upon him. Many of the patients at Harding Hospital get out of their rooms and out of the building while participating in any one of a group of activities tailored to the needs of the person.

24. Under the milieu therapy method careful medical supervision of the patient is required twenty-four hours a day.

25. During the years in suit the Hospital had a capacity of approximately one hundred and twenty beds.

26. The staff at the Hospital was organized in the following manner:

(A) The attending staff. This was composed of psychiatrists who had offices in the Hospital and who had the overall responsibility of supervising the treatment received by the patients and the functions of the nurses. The attending staff has the responsibility of attending Hospital meetings and participating in the activities of the Hospital. Only the attending staff had the right to vote at medical staff meetings.

(B) The associate staff. This was composed of physicians who, although not necessarily psychiatrists, had rights to admit and treat patients in the Hospital. Their responsibilities were less than the members of the attending staff. They had no right to vote at staff meetings, they did not have to be present at the Hospital at all times as did the attending staff and they had no supervisory power over the Hospital's nursing or paramedical staffs.

(C) The consulting staff. The consulting staff consisted of doctors who were available to treat the psychiatric patients at the Hospital for medical but not necessarily psychiatric conditions. During the years in suit, approximately seventeen doctors were members of the consulting staff.

(D) Resident staff. This was composed of residents in the Hospital. Only one or two doctors were on the resident staff during the years in suit.

(E) Paramedical staff. This was composed of psychologists and social workers who were available to assist in the therapy program for the Harding Hospital patients. During the years in suit, approximately eight people were on the paramedical staff.

(F) Nursing staff.

27. During the years in suit the members of the attending staff were as follows:

1966:

George T. Harding, III
Charles Harding
George T. Harding, IV
Herndon P. Harding
Donald Burk
Richard G. Griffin

1967:

George T. Harding, III
Charles W. Harding
George T. Harding, IV
Donald Burk
Herndon P. Harding
Richard G. Griffin
Richard L. Boumgartner
Irving Pine
John A. Wheildon
William E. Todd

1968:

George T. Harding, III
Charles W. Harding
George T. Harding, IV
Herndon Harding
Donald Burk
Richard G. Griffin
Richard L. Boumgartner

28. The attending staff were the professional persons who participated in and were responsible for the total program of the Hospital, treating patients, directing programs and participating in the staff policy.

29. The associate staff had the privilege of admitting and treating patients at the Hospital. However, in the years at suit the members of the Associates treated ninety to ninety-five percent of the patients admitted to the Hospital.

30. Prior to the 1962 reorganization of the Hospital the Associates treated ninety to ninety-five percent of the patients at the Hospital. They also provided all of the services that had to have been rendered by a medical doctor at the Hospital; that is, all medical supervision, supervision of the Hospital's pharmacy and laboratory and supervision of the nurses. After the reorganization the Associates continued to provide basically these same services, and continued to treat almost all of the patients admitted to the Hospital.

31. The Harding-Evans Foundation is a tax exempt Ohio corporation, not for profit, organized for scientific, educational and charitable purposes and specifically for the training of psychiatrists, nurses and others for the diagnosis and treatment of mental illness. The Foundation was set up in 1959 and is an entity separate from the Hospital and the Associates. The principle activity of the Foundation is to provide a residency program in the field of psychiatry for physicians. The Foundation collects charitable funds and expends them upon the residency training program at the Hospital.

32. The Hospital does not participate in or intervene in (including the publishing or distributing of statements) any political campaign on behalf of any candidate for public office.

33. No substantial part of activities of the Hospital is carrying on propaganda or otherwise attempting to influence legislation.

34. Since 1963 a majority of the Board of Trustees of the Hospital have been persons who are not connected with Harding-Evans Medical Associates, Inc., or related to the Harding family in any way. Prior to 1962 the Harding family itself made up the Board of Trustees.[13]

35. During the years 1966–1968, George T. Harding, III was the Medical Director of the Hospital, a member of the Board of Trustees of Harding Hospital, Inc., and stockholder in Harding-Evans Associates, Inc.

### Discussion

The sole legal issue to be decided in this action is whether the plaintiff was exempt from the payment of federal income tax during the years in question under the provisions of 26 U.S.C. § 501(a) as an exempt organization as described in 26 U.S.C. § 501(c)(3).

The pertinent statutes in issue provide as follows:

(c) List of exempt organizations. —The following organizations are referred to in subsection (a):

(1) Corporations organized under Act of Congress, if such corporations are instrumentalities of the United States and if, under such Act, as amended and supplemented, such corporations are exempt from Federal income taxes.

(2) Corporations organized for the exclusive purpose of holding title to property, collecting income therefrom, and turning over the entire amount thereof, less expenses, to an organization which itself is exempt under this section.

(3) Corporations, and any community chest, fund, or foundation, *organized and operated exclusively for* religious, *charitable,* scientific, testing for public safety, literary, or educational *purposes,* or for the prevention of cruelty to children or animals, *no part of the net earnings of which inures to the benefit of any private shareholder or individual,* no substantial part of the activities of which is carrying on propa-

---

13. Stipulation number 19 contains the names and qualifications of the Board of Trustees during the years in question.

ganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office. [Emphasis added.] [14]

It is the determination of the Court that the plaintiff was not "organized and operated exclusively for . . . charitable . . . purposes, . . . no part of the net earnings of which inures to the benefit of any pri-

vate shareholder or individual . . ." and therefore the statutory exemption does not apply.

Of initial interest to the Court is the type and amount of the alleged charity work performed by the Hospital. The Hospital has introduced testimony concerning the Menninger Foundation and the Shepherd-Pratte Hospital as examples of exempt organizations. An apparent major point of distinction exists between these two institutions and the Hospital which precludes the plaintiff from deriving a beneficial analogy.

---

14. These sections are from Title 26, U.S.C. The Commissioner's standards and opinions relative to when a hospital is exempt are set forth in Rev.Rul. 56–185, 1956–1 C.B. 202 which provides in pertinent part:

In order for a hospital to establish that it is exempt as a public charitable organization within the contemplation of section 501(c)(3), it must, among other things, show that it meets the following general requirements:

1. It must be organized as a non-profit charitable organization for the purpose of operating a hospital for the care of the sick. A nonprofit hospital chartered only in general terms as a charitable corporation can meet the test as being organized exclusively for charitable purposes. See Commissioner v. Battle Creek, Inc. [5 Cir.,] 126 Fed. (2d) 405.

2. It must be operated to the extent of its financial ability for those not able to pay for the services rendered and not exclusively for those who are able and expected to pay. It is normal for hospitals to charge those able to pay for services rendered in order to meet the operating expenses of the institution, without denying medical care or treatment to others unable to pay. The fact that its charity record is relatively low is not conclusive that a hospital is not operated for charitable purposes to the full extent of its financial ability. It may furnish services at reduced rates which are below cost, and thereby render charity in that manner. It may also set aside earnings which it uses for improvements and additions to hospital facilities. It must not, however, refuse to accept patients in need of hospital care who cannot pay for such services. Furthermore, if it operates with the expectation of full payment from all those to whom it renders services, it

does not dispense charity merely because some of its patients fail to pay for the services rendered.

3. It must not restrict the use of its facilities to a particular group of physicians and surgeons, such as a medical partnership or association, to the exclusion of all other qualified doctors. Such limitation on the use of hospital facilities is inconsistent with the public service concept inherent in section 501(c)(3) and the prohibition against the inurement of benefits to private shareholders or individuals. It is recognized, however, that in the operation of a hospital there must of necessity be some discretionary authority in the management to approve the qualifications of those applying for the use of the medical facilities. The size and nature of facilities may also make it necessary to impose limitations on the extent to which they may be made available to all reputable and competent physicians in the area.

4. Its net earnings must not inure directly or indirectly to the benefit of any private shareholder or individual. This includes the use by or benefit to its members of its earnings by way of a distribution of profits, the payment of excessive rents or excessive salaries, or the use of its facilities to serve their private interests. If provision is made in the bylaws for dividends, exemption will not be allowed even though no dividends have been declared. Exemption will not be defeated, however, merely because the shareholders or members might possibly at some future date share in the assets upon dissolution in the absence of a case of mala fides where there appears to be a plan on the part of the shareholder or individual to acquire assets on the dissolution of the corporation.

The Shepherd-Pratte Hospital in Towson, Maryland operates a community health center, albeit funded by the state, providing medical services to the public regardless of the patient's ability to pay. The Menninger Clinic in Topeka, Kansas, which is part of the Menninger Foundation,[15] operates a ghetto clinic in downtown Topeka. Although spacially apart from the Clinic, the Clinic staffs and operates the ghetto clinic which offers free medical services to the general public. The Hospital does not operate any similar medical facility which is available to the public at large without regard to the patient's ability to pay.

The plaintiff maintains that it does provide medical services at its facilities to persons unable to pay. The record reveals that the Hospital actually provides a very small amount of free charitable service. The greatest part of the alleged free service consists of paying patients who have undergone considerable treatment over a period of time at the Hospital and who then run out of funds. The Hospital on occasion retains the patient without charge or at a reduced rate. Mr. Hagle testified that the number of persons in this category averaged about thirty-five to forty per year. Hagle further testified that less than ten persons a year were admitted on a totally free basis. Indeed, according to Dr. George T. Harding, III's testimony, the Hospital viewed all patients as paying patients initially and that it was a rare case where a person would be admitted on a completely free basis.[16]

Mr. Hagle's testimony shows that between April, 1966 and December, 1967 at least five hundred patients were admitted to the Hospital for the first time. Considering such a number of first admissions, the treatment of thirty-five to forty patients a year at a reduced rate, or for no charge, after their funds became depleted is *de minimus* charitable care and the rare admission of completely indigent persons constitutes "virtually inconsequential" charitable operation. *See* Sonora Community Hospital v. Commissioner of Internal Revenue, 46 T.C. 519, 526 (1966), aff'd per curiam, 397 F.2d 814 (9th Cir. 1968). Certainly the plaintiff cannot be considered in the same class as the hospital in Intercity Hospital Ass'n v. Squire, 56 F.Supp. 472 (D.C.Wash.1944) where patients were admitted without regard to their ability to pay.

From all of the evidence before the Court it is clear to the Court that the plaintiff never ". . . held itself out to the public even in a limited way as a charitable institution." Sonora Community Hospital v. Commissioner of Internal Revenue, *supra* 46 T.C. at 526.

The Hospital also maintains that it renders a general charitable service to the community by training residents and nurses. It is true that the Hospital does make its facilities available for the training of nurses and resident psychiatrists. These programs, however, are not paid for by the Hospital but are directly and completely funded by the Harding-Evans Foundation which is an exempt organization. And, of course, the Hospital receives the benefit of having the participating residents perform medical duties at the Hospital.

The Court is persuaded, after having entertained all of the evidence, that the Hospital was not organized and operated exclusively for charitable purposes but on the contrary was organized

15. Apparently it is the Menninger Foundation which is an exempt organization in its entirety.

16. The following answer by Dr. Harding is revealing:

Q. Doctor, when a patient, as in the case you have just given, comes to the Harding Hospital for evaluation, do they present themselves as a paying patient or as a charity patient?

A. All of them present themselves as paying patients practically, but then they tell us that they haven't any funds' that they just can't pay it, or their answer—Trial transcript p. 242.

It is also clear from Dr. Harding's testimony that no indigent will be admitted without first being examined to determine if he would fit into the treatment program at the Hospital.

and operated primarily for the benefit of the psychiatrists who were members of the Harding-Evans Associates.

The Hospital's reorganization in late 1961 was purportedly for charitable purposes. The 1961 amendments to the plaintiff's articles of incorporation so state.[17] The actual substance of the transaction was different.

Before 1962 when the Hospital operated as a corporation for profit the Associates performed all of the medical psychiatric treatment on ninety to ninety-five percent of the patients admitted to the Hospital. After the reorganization of December, 1961, and during the years in issue, the Associates continued to treat at least ninety to ninety-five percent of the patients admitted. Certainly the Associates were paid by the patients for the medical services performed and, other than the money paid under the written agreements, the Hospital did not directly pay any of its net earnings to the Associates. But the Associates were in the position of deriving the benefit of treating almost one hundred percent of the patients at the Hospital. This virtual monopoly by the Associates returned substantial profits to the members of the Associates.[18] As one commentator has stated:

. . . But if a particular individual or limited number of individuals reap commercial benefits from the operation of the instrumentality, though they do not do so by direct acquisition or payment over to them of its earnings, the earnings may nevertheless "inure" to their "benefit" within the intendment of such phrasing so as to destroy the exempt status. 6 Mertens,

Law of Federal Income Taxation, § 34.13 at pgs. 63–64 (1968). (Citing the *Sonora* case, *supra*).

The evidence is perfectly clear that if the Associates did not have available, to their practically exclusive use, the Hospital's facilities then they would no longer be able to practice their particular form of psychiatric treatment, the milieu therapy. Dr. Harding and Mr. Sandefur [19] admitted that the Associates would, without the Hospital, have to procure a physical plant of similar size and furnishment or discontinue the type of medical psychiatric practice that the Associates had utilized for many years.

Prior to the December, 1961 reorganization, the Associates were the Hospital's attending staff. No additions were made thereto between 1961 and 1966. In 1968 the attending staff included only one physician who was not a member of the Associates. In 1967 four non-Associates were members of the attending staff.[20]

The Associates, pursuant to the various written agreements with the Hospital, provided the overall medical supervision and direction for the day to day operation of the Hospital for the years in question. In practice, the Associates also actually treated ninety to ninety-five percent of the patients admitted to Harding in the years in question. The Associates were, of course, provided offices at the Hospital wherein they could treat their own private patients as well as the Hospital's patients.

The Hospital maintains that its staffs were open to any physicians or psychiatrists who wished to practice there.

17. See plaintiff's exhibit 1.

18. The salaries of the Associates for the years in issue have been read into the record and it is unnecessary for the Court to list them here but the average salary ranged from approximately $30,000 to $40,000 per year. See transcript pgs. 299–300.

19. Cree Sandefur is a member of the Hospital's Board of Trustees.

20. The plaintiff attempted to show at trial that more non-Associates were on the attending staff in the years in question; see plaintiff's exhibits 7, 8. This evidence contradicted the data found in the stipulation of the parties. The parties agreed in the stipulations that evidence inconsistent therewith could not be admitted. In any event, the total evidence adduced at trial supports the stipulations which are reflected in the Court's finding of fact number 27.

The government admitted that it could not find any instances where any doctor or psychiatrist was excluded from the Hospital's staffs. Of course, most of the members of the associate staff did not belong to the Associates, but the attending staff had total control over the Hospital's operation and policies and themselves treated almost all of the patients.

Even though other psychiatrists under the policy of the Hospital were free to come to the Hospital to treat patients and join the attending staff, the plain fact is that such outsiders come to the Hospital only in rare instances. Psychiatrists other than the Associates were simply not able to fit into the treatment schedules or procedures mandated by the milieu therapy as practiced at the Hospital by the Associates. Thus, while the Hospital never directly excluded any doctor from treating patients there the type of treatment virtually exclusively practiced at the Hospital by the Associates had the *de facto* effect of limiting practice at the Hospital to the Associates.

Prior to 1962, the Board of Trustees governing the Hospital was completely staffed by members of the Harding family. After 1963 it is true that a majority of the Board were persons other than the Associates or the Harding family. The Board was authorized to appoint new members to the Hospital's staffs. Nominees for appointment, however, were referred to the Board after an election was held at a staff meeting. Only the attending staff could vote and the vote had to be unanimous for a nominee for staff membership to be forwarded to the Board. Thus, the Associates possessed a veto power over new memberships in any of the Hospital's staffs, including the attending staff.

It would amount to an exercise in exultation of form over substance, which the Court refuses to do, to declare that the Harding Hospital, in the years at issue, was operated exclusively for charitable purposes with no part of the Hospital's net earnings inuring to the benefit of any private person. It is axiomatic that each case involving tax exemption of hospitals must be decided according to its particular facts. One test stands clear, however, that exemption has been denied where hospitals are operated to a considerable extent for the benefit of the founders or owners. Maynard Hospital, Inc. v. Commissioner of Internal Revenue, 52 T.C. 1006, 1030 (1969); Sonora Community Hospital v. Commissioner of Internal Revenue, 46 T.C. 519 (1966), aff'd per curiam, 397 F.2d 814 (9th Cir. 1968); *see also* Rev. Rul. 56–185, 1956–1, C.B. 202.

From all of the relevant facts appearing in this action it is the Court's holding that the plaintiff, for the tax years in question, was operated almost exclusively for the benefit of the members of the Harding-Evans Medical Associates and was not operated exclusively for charitable purposes.

*Conclusions of Law*

1. The Court has jurisdiction over the parties and the subject matter of the action. Venue properly lies in this Court.

2. The plaintiff was not organized and operated exclusively for charitable purposes.

3. The plaintiff was operated for the substantial if not exclusive benefit of the Associates.

4. The plaintiff is not entitled to exempt status under the provisions of 26 U.S.C. § 501(c)(3) as they existed during the years at issue.

5. The Internal Revenue Service correctly determined that the plaintiff was not an exempt organization.