**HARDING HOSPITAL, INC., Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

**No. 73–1661.**

United States Court of Appeals, Sixth Circuit.

Nov. 13, 1974.

Herbert R. Brown, Vorys, Sater, Seymour & Pease, Richard R. Stedman, By-

ron E. Ford, Columbus, Ohio, for plaintiff-appellant.

William W. Milligan, U. S. Atty., Columbus, Ohio, Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Thomas R. Jones, Donald R. Anderson, Elmer Kelsey, Murray S. Horwitz, Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before PHILLIPS, Chief Judge, and EDWARDS and PECK, Circuit Judges.

PHILLIPS, Chief Judge.

The sole issue presented in this appeal is whether Harding Hospital, Inc. (the Hospital) qualified under § 501(c)(3) of the Internal Revenue Code of 1954 as an organization exempt from federal income taxes during the years 1966, 1967 and 1968. The District Court determined, *inter alia*, that the Hospital was not operated exclusively for charitable purposes and denied the exemption. We affirm.

### I.

Reference is made to the opinion of the District Court for a comprehensive statement of the facts. 358 F.Supp. 805, 806–810 (S.D.Ohio 1973).

The Hospital commenced this civil tax refund suit to recover $141,730 from the United States. That sum represented the aggregate amount of income taxes which the Hospital paid for the three years in question.

The Hospital, a nationally recognized psychiatric institution, treats mental and nervous diseases. It utilizes a method of treatment known as milieu therapy in which a patient's total environment is controlled on an around the clock basis and structured toward rehabilitation.

The Hospital was originally a corporation for profit. In December 1961, its articles of incorporation were amended to adopt its present name and to qualify under Ohio law as a corporation not for profit. In the reorganization, the shareholders of the predecessor corporation exchanged their stock which was valued at approximately $3,800 per share for notes having a face value of $3,000 per share and bearing interest at the annual rate of four per cent.

The reorganization was carried out along guidelines established through conferences with officials of the Exempt Organizations Branch of the Internal Revenue Service (IRS). In 1962 the IRS issued a tentative ruling that the Hospital was exempt from paying federal income taxes under § 501(c)(3) of the Code. In a letter dated December 1, 1965, the IRS indicated that it proposed to revoke the tentative exemption ruling issued in 1962. On November 14, 1968, the District Director of the IRS issued a determination letter revoking the tentative ruling of 1962. The Hospital was declared not to be exempt and thus was required to file federal income tax returns. Since the Hospital had relied on the 1962 ruling, the IRS determined that the revocation of the 1962 ruling would not be applied prior to January 1, 1966.

Before amending its articles of incorporation, the Hospital had a contract with a medical partnership composed of seven doctors. This medical partnership performed all the psychiatric treatment on ninety to ninety-five per cent of the patients admitted to the Hospital. Immediately after the Hospital's change in status in 1962, the medical partnership was incorporated as the Harding-Evans Medical Associates, Inc. (the Associates).

Starting in 1962, and for the years in question, the Hospital entered into contracts with the Associates whereby the Associates provided medical supervision in the Hospital, teaching and supervision in the residency and other training programs, and medical service to the Hospital's indigent patients without a charge or at a reduced rate. For these services, the Hospital paid the Associates an annual amount of $25,000. This amount was raised to $35,000 as of July 1, 1968. Further, the agreement provided that the Associates were to pay the Hospital $1,000 per month as rental for facilities, equipment and business of-

fice services. This rental was increased to $35,000 per year as of January 1, 1965. It subsequently was lowered to $15,000 per year as of July 1, 1968, at the same time that the amount which the Hospital paid the Associates for medical supervision was increased from $25,000 to $35,000.

Since 1963, individuals not connected with the Associates have constituted a majority of the Board of Trustees of the Hospital. During the years in question, the Board consisted of nine members, only two of whom had any connection with the Associates of the Hospital prior to the 1961 reorganization.

The Harding-Evans Foundation (the Foundation) was set up in 1959 and is an entity separate from the Hospital and the Associates. The Foundation is a tax exempt organization, the principal activity of which is to provide a residency program in the field of psychiatry for the physicians. The Foundation collects charitable funds and expends them on the residency training program at the Hospital.

## II.

Since the early days of federal income tax law, corporations organized and operated exclusively for charitable, religious, educational and certain other purposes have been accorded exemption from the tax. Act of Oct. 3, 1913, c. 16, § II, G, 38 Stat. 172. The exemption is conferred in recognition of the benefit which the public derives from the activities of such organizations. *See, e.g.,* Trinidad v. Sagrada Orden, 263 U.S. 578, 581, 44 S.Ct. 204, 68 L.Ed. 458 (1924); St. Louis Union Trust Co. v. United States, 374 F.2d 427, 432 (8th Cir. 1967).

"[T]he Government is compensated for the loss of revenue [caused by the exemption] by its relief from financial burden which would otherwise have to be met by appropriations from public funds, and by the benefits resulting from the promotion of the general welfare." H.Rep.No.1860, 75th Cong., 3d Sess., p. 19 (1939–1 Cum. Bull. (Part 2) 728, 742).

■ An exemption is an exception to the norm of taxation. An organization which seeks to obtain tax exempt status, therefore, bears a heavy burden to prove that it satisfies all the requirements of the exemption statute. The Supreme Court repeatedly has said that exemptions from taxation are not granted by implication. *See, e.g.,* Mescalero Apache Tribe v. Jones, 411 U.S. 145, 156, 93 S. Ct. 1267, 36 L.Ed.2d 114 (1973), and authorities therein cited. The Tax Court has stated consistently that "[a] statute creating an exemption must be strictly construed and any doubt must be resolved in favor of the taxing power." American Automobile Association v. Commissioner, 19 T.C. 1146, 1158 (1953); Associated Industries of Cleveland v. Commissioner, 7 T.C. 1449, 1464 (1946).

Section 501(a) of the Code provides that the following organizations, which are listed in § 501(c)(3), are exempt from federal income taxation:

"Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office."

In the context of the present case, this section essentially imposes three requirements for exemption: 1) the corporation must be organized and operated *exclusively* for charitable purposes; 2) *no part* of its net earnings may inure to the benefit of a private individual or share-

holder; and 3) it cannot engage in certain lobbying and political activities. The Government stipulated that the Hospital did not offend the third requirement for exemption.

The requirements in § 501(c)(3) are stated in the conjunctive. A taxpayer's failure to satisfy any one of them therefore causes a loss of the tax exemption. Stevens Bros. Foundation, Inc. v. Commissioner, 324 F.2d 633 (8th Cir. 1963), cert. denied, 376 U.S. 969, 84 S. Ct. 1135, 12 L.Ed.2d 84 (1964). Consequently, the Hospital must satisfy both the first and second requirements listed above in order to qualify for exemption from income taxation during the years in question.

The term "exclusively", as used in § 501(c)(3), means that an organization is not exempt if it has any substantial noncharitable purpose. Better Business Bureau v. United States, 326 U.S. 279, 283, 66 S.Ct. 112, 90 L.Ed. 67 (1945); Seasongood v. Commissioner, 227 F.2d 907, 910 (6th Cir. 1955). This view is supported by Treas.Reg. § 1.-501(c)(3)–1(c)(2) which states:

> "An organization is not operated exclusively for one or more exempt purposes if its net earnings inure in whole or in part to the benefit of private shareholders or individuals. * * * *"

and by Treas.Reg. § 1.501(c)(3)–1(d)(1) (ii) which provides as follows:

> "An organization is not organized or operated exclusively for one or more of the purposes specified in subdivision (i) of this subparagraph unless it serves a public rather than a private interest. Thus, to meet the requirement of this subdivision, it is necessary for an organization to establish that it is not organized or operated for the benefit of private interests such as designated individuals, the creator or his family, shareholders of the organization, or persons controlled, directly or indirectly, by such private interests."

The term "charitable" is used in § 501(c)(3) in its generally accepted legal sense and is, therefore, not to be construed as limited by the separate enumeration in § 501(c)(3) of other tax exempt purposes which may fall within the broad outlines of "charity" as developed by judicial decisions. Treas.Reg. § 1.501(c)(3)–1(d)(2).

The phrase "net earnings", as used in § 501(c)(3), may include "more than the term net profits as shown by the books of the organization or than the difference between the gross receipts and disbursements in dollars." Northwestern Municipal Ass'n v. United States, 99 F.2d 460, 463 (8th Cir. 1938). Earnings may inure to an individual in ways other than through the distribution of dividends. 6 Mertens, Law of Income Taxation, § 34.13, at 63 (1968 ed.).

> "[I]f a particular individual or limited number of individuals reap commercial benefits from the operation of the instrumentality, though they do not do so by direct acquisition or payment over to them of its earnings, the earnings may nevertheless 'inure' to their 'benefit' within the intendment of such phrasing so as to destroy the exempt status." *Id.* at 63–64.

*See, e.g.,* Chattanooga Automobile Club v. Commissioner, 182 F.2d 551 (6th Cir. 1950), in which this court, speaking through Judge Martin, determined that the benefits of an automobile club, such as emergency road service, free tourist information and an insurance policy, inured to the benefit of private individuals. In that case, two automobile clubs affiliated with the American Automobile Association were denied tax exemptions.

The Commissioner's standards relative to when a hospital is exempt under § 501(c)(3) are set forth in Rev.Rul. 56–185, 1956–1 Cum.Bull. 202, which provides in pertinent part:

> "In order for a hospital to establish that it is exempt as a public charitable organization within the contemplation of section 501(c)(3), it must,

among other things, show that it meets the following general requirements:

"1. It must be organized as a nonprofit charitable organization for the purpose of operating a hospital for the care of the sick. A nonprofit hospital chartered only in general terms as a charitable corporation can meet the test as being organized exclusively for charitable purposes. See Commissioner v. Battle Creek, Inc., 126 F.2d 405.

"2. It must be operated to the extent of its financial ability for those not able to pay for the services rendered and not exclusively for those who are able and expected to pay. It is normal for hospitals to charge those able to pay for services rendered in order to meet the operating expenses of the institution, without denying medical care or treatment to others unable to pay. The fact that its charity record is relatively low is not conclusive that a hospital is not operated for charitable purposes to the full extent of its financial ability. It may furnish services at reduced rates which are below cost, and thereby render charity in that manner. It may also set aside earnings which it uses for improvements and additions to hospital facilities. It must not, however, refuse to accept patients in need of hospital care who cannot pay for such services. Furthermore, if it operates with the expectation of full payment from all those to whom it renders services, it does not dispense charity merely because some of its patients fail to pay for the services rendered.

"3. It must not restrict the use of its facilities to a particular group of physicians and surgeons, such as a medical partnership or association, to the exclusion of all other qualified doctors. Such limitation on the use of hospital facilities is inconsistent with the public service concept inherent in section 501(c)(3) and the prohibition against the inurement of benefits to private shareholders or individuals. It is recognized, however, that in the operation of a hospital there must of necessity be some discretionary authority in the management to approve the qualifications of those applying for the use of the medical facilities. The size and nature of facilities may also make it necessary to impose limitations on the extent to which they may be made available to all reputable and competent physicians in the area.

"4. Its net earnings must not inure directly or indirectly to the benefit of any private shareholder or individual. This includes the use by or benefit to its members of its earnings by way of a distribution of profits, the payment of excessive rents or excessive salaries, or the use of its facilities to serve their private interests. If provision is made in the bylaws for dividends, exemption will not be allowed even though no dividends have been declared. Exemption will not be defeated, however, merely because the shareholders or members might possibly at some future date share in the assets upon dissolution in the absence of a case of mala fides where there appears to be a plan on the part of the shareholder or individual to acquire assets on the dissolution of the corporation.

"A community hospital of the type supported partly by contributions from the general public and/or public grants from a city, county, or state, normally meets the requirements of section 501(c)(3) as a public charitable organization. It is formed for the purpose of furnishing hospital facilities to all persons in the community at the lowest possible cost and necessarily accepts patients who are unable to pay for hospital facilities in order to retain the support of the community. A nominal charity record for a given period of time, in the absence of char-

itable demands of the community, will not affect its right to continued exemption. On the other hand, a hospital formed by one or more physicians in a community who may own the capital stock thereof or rent the hospital facilities to a corporation which they control requires careful study to determine whether it is being operated in part to serve their interest, directly or indirectly. See I.T. 2421, C.B. VII–2, 150 (1928)."

The Commissioner modified Rev.Rul. 56–185, especially the second numbered paragraph thereof, in Rev.Rul. 69–545, 1969–2 Cum.Bull. 117. There the Commissioner held that Hospital A as described therein qualified as a tax exempt charitable hospital even though it did not provide free or reduced rate services to indigents other than emergency care. Rev.Rul. 69–545 provides in part:

"In the general law of charity, the promotion of health is considered to be a charitable purpose. Restatement (Second), Trusts, sec. 368 and sec. 372; IV Scott on Trusts (3rd ed. 1967), sec. 368 and sec. 372. A nonprofit organization whose purpose and activity are providing hospital care is promoting health and may, therefore, qualify as organized and operated in furtherance of a charitable purpose. If it meets the other requirements of section 501(c)(3) of the Code, it will qualify for exemption from Federal income tax under section 501(a).

"Since the purpose and activity of Hospital A, apart from its related educational and research activities and purposes, are providing hospital care on a nonprofit basis for members of its community, it is organized and operated in furtherance of a purpose considered 'charitable' in the generally accepted legal sense of that term. The promotion of health, like the relief of poverty and the advancement of education and religion, is one of the purposes in the general law of charity that is deemed beneficial to the community as a whole even though the class of beneficiaries eligible to receive a direct benefit from its activities does not include all members of the community, such as indigent members of the community, provided that the class is not so small that its relief is not of benefit to the community. Restatement (Second), Trusts, sec. 368, comment (b) and sec. 372, comments (b) and (c); IV Scott on Trusts (3rd ed. 1967), sec. 368 and sec. 372.2. By operating an emergency room open to all persons and by providing hospital care for all those persons in the community able to pay the cost thereof either directly or through third party reimbursement, Hospital A is promoting the health of a class of persons that is broad enough to benefit the community.

"The fact that Hospital A operates at an annual surplus of receipts over disbursements does not preclude its exemption. By using its surplus funds to improve the quality of patient care, expand its facilities, and advance its medical training, education, and research programs, the hospital is operating in furtherance of its exempt purposes.

"Furthermore, Hospital A is operated to serve a public rather than a private interest. Control of the hospital rests with its board of trustees, which is composed of independent civic leaders. The hospital maintains an open medical staff, with privileges available to all qualified physicians. Members of its active medical staff have the privilege of leasing available space in its medical building. (See Rev.Rul. 69–464, page 132, this Bulletin.) It operates an active and generally accessible emergency room. These factors indicate that the use and control of Hospital A are for the benefit of the public and that no part of the income of the organization is inuring to the benefit of any private individual nor is any private interest being served.

"Accordingly, it is held that Hospital A is exempt from Federal income tax under section 501(c)(3) of the Code.

\* \* \* \* \* \*

"Revenue Ruling 56–185, C.B. 1956–1, 202, sets forth requirements for exemption of hospitals under section 501(c)(3) more restrictive than those contained in this Revenue Ruling with respect to caring for patients without charge or at rates below cost. In addition, the fourth requirement of Revenue Ruling 56–185 is ambiguous in that it can be read as implying that the possibility of "shareholders" or "members" sharing in the assets of a hospital upon its dissolution will not preclude exemption of the hospital as a charity described in section 501(c)(3) of the Code. Section 1.-501(c)(3)–1(b)(4) of the regulations promulgated subsequent to Revenue Ruling 56–185 makes it clear, however, that an absolute dedication of assets to charity is a precondition to exemption under section 501(c)(3) of the Code.

"Revenue Ruling 56–185 is hereby modified to remove therefrom the requirements relating to caring for patients without charge or at rates below cost. Furthermore, requirement four has been modified by section 1.-501(c)(3)–1(b)(4) of the regulations."

### III.

Applying the above principles to the present case, we proceed to determine if the District Court was correct in holding that the Hospital "was operated almost exclusively for the benefit of the members of the . . . Associates and was not operated exclusively for charitable purposes." 358 F.Supp. at 814. We bear in mind the admonition contained in Rev.Rul. 56–185:

"[A] hospital formed by one or more physicians in a community who may own the capital stock thereof or rent the hospital facilities to a corporation which they control requires *careful study* to determine whether it is being operated in part to serve their interest, *directly* or *indirectly*." (Emphasis added.)

On its facts we consider this to be a much closer case than the decisions cited as precedent by the District Court. Maynard Hospital, Inc. v. Commissioner, 52 T.C. 1006 (1969); Sonora Community Hospital v. Commissioner, 46 T.C. 519 (1966), aff'd, 397 F.2d 814 (9th Cir. 1968); Lorain Avenue Clinic v. Commissioner, 31 T.C. 141 (1958). The 1961 reorganization was conducted pursuant to the advice of officials of the Exempt Organizations Branch of the IRS. The doctor-shareholders of the predecessor corporation indicated some degree of charitable intent in exchanging their stock appraised at approximately $3,800 per share for notes with a face value of $3,000. Further, the notes bore interest at a rate of four percent per annum, which was below the going rate. Control of the Board of Trustees of the hospital was taken out of the hands of the shareholders of the predecessor corporation. For the years in question, the Hospital had an independent board, unlike the hospitals in *Maynard Hospital* and *Sonora Community Hospital.*

Likewise, some educational, training and community-oriented programs were conducted at the Hospital, e.g., training program for psychiatric residents, training program for nurses and social workers, day care treatment program enabling patients to carry on jobs, halfway house for patients not sufficiently mentally ill to stay in the Hospital, family care program to place patients in a home situation. There is no indication that such programs existed in the hospitals in *Maynard Hospital, Sonora Community Hospital* or *Lorain Avenue Clinic.* The record demonstrates to our satisfaction, however, that these programs of the Hospital were either conducted by the Foundation, the tax exemption of which is not questioned, or were provided by the Hospital as a part of its regular program of care (not even in part on a planned free or below cost basis).

With respect to the provision of free or below cost care, the Hospital relies on

Rev.Rul. 69–545 in which the Commissioner held that a hospital qualified for exemption even though it did not provide free or reduced rate services to indigents other than emergency care. This regulation was ruled to be valid by a two-to-one decision in Eastern Kentucky Welfare Rights Organization v. Simon, 506 F.2d 1278 (D.C.Cir. 1974), rev'g 370 F.Supp. 325 (D.D.C. 1973). Judge J. Skelly Wright dissented, expressing the view that Rev.Rul. 69–545 is invalid.

We find it unnecessary in the present case to pass judgment on the validity of Rev.Rul. 69–545. The issue was neither briefed nor argued before us. Further, the combination of factors set forth in § IV of this opinion requires denial of the tax exemption even if Rev.Rul. 69–545 should be determined to be valid.

■ With respect to those educational and training programs conducted at the Hospital by the Foundation, we conclude that the Hospital's participation in these programs is not sufficient to merit its tax exemption. The Hospital was established to provide psychiatric medical care. The Foundation was incorporated separately to conduct these educational and training programs. We have no basis whatsoever for holding clearly erroneous the following finding of the District Court:

> "These programs . . . are not paid for by the Hospital but are directly and completely funded by the . . . Foundation which is an exempt organization . . . . of course, the Hospital receives the benefit of having the participating residents perform medical duties at the Hospital." 358 F.Supp. at 812.

Since the Hospital does not fund these programs and in fact receives an incidental benefit from them *a fortiori* it cannot obtain a tax exemption on the basis of them.

■ Not only is this case considerably different than the precedents relied on by the District Court, but there are two Government contentions here which we feel compelled to reject. The Government contends that if the Associates did not have the Hospital's facilities available they would no longer be able to practice milieu therapy. This contention is incorrect from both a factual and legal standpoint. There is convincing evidence in the record from several sources that the well qualified psychiatrists who practiced at the Hospital could be employed at another psychiatric institution if they so desired.[1] Further, we know of no authority for the legal argument that because a hospital is needed by doctors to practice their specialty the hospital cannot claim a tax exemption. Acceptance of such a proposition might eliminate tax exemptions for a substantial number of hospitals in that nearly all medical specialists require a hospital in which to practice, e. g., surgeons and heart transplant specialists require highly specialized hospital facilities.

■ Equally misfounded is the Government's contention that we should penalize the Hospital with loss of its tax exemption because the Associates' milieu therapy type of treatment acts as a *de facto* limitation on the staff of the Hospital. See the third requirement of Rev.Rul. 56–185. To adopt such a proposition might effectively read out of the law the ability of any specialized hospital, e. g., milieu therapy psychiatric institution, cancer research hospital, skin treatment clinic, to acquire tax exempt status. To our knowledge, neither Congress nor the Commissioner has ever manifested such an intent, and it is not

---

1. The record reveals that the doctors who were members of the Associates were well qualified, apparently unlike the doctors who founded the hospital in *Sonora Community Hospital, supra,* because they were "virtually tossed out of" another hospital. However, we cannot decide an issue of tax exemption on the basis of the doctors' qualifications or whether the hospital involved is nationally known. The same standards for tax exemption apply to those hospitals as they do to hospitals of only local import and with less than outstanding medical staffs.

mandated by the third requirement of Rev.Rul. 56–185.

These two Government contentions, if upheld, might have a stifling effect on the creation of charitable hospitals which serve a special medical purpose. Such contentions disserve one of the congressional purposes behind § 501, i. e., to promote the creation of charitable institutions which provide health care.

## IV.

■ Although there are factual differences between this case and the three cases relied on by the District Court, those differences are not dispositive. We find it impossible to conclude either that the Hospital was organized and operated *exclusively* for charitable purposes or that *no part* of its net earnings inured to the benefit of a private individual. Based on the five factors set forth below, we hold that the Hospital was not entitled to tax exemption under § 501(c)(3) during the years in question. We do not single out any one or combination of these factors as the consideration crucial to our holding. We conclude only that all these factors, as they occurred in the aggregate in this case, require denying the appellant Hospital the tax exemption for the years in question.

1) There is insufficient evidence that the appellant Hospital for the years in question "held itself out to the public even in a limited way as a charitable institution." *Sonora Community Hospital, supra,* 46 T.C. at 526. Insofar as the record reveals, the only significant charitable donations which the Hospital received during the years in question, if any, were contributions of Hospital notes held by the Associates.

2) The Hospital did not have a specific plan or policy for the treatment of charity patients during the years in question. Rather, as its Medical Director admitted, practically all patients presented themselves as paying patients and only when their funds were exhausted did the Hospital treat them on a charitable basis.

We are cognizant of the statistics which reveal that the ratio of uncompensated services to total revenue at the Hospital ranged from 4.25 per cent to 7.78 per cent for the years in question. These figures admittedly are higher than those for some other area hospitals and those hospitals for which exemptions have been denied. *Maynard Hospital, supra,* 52 T.C. at 1026 (Charity work constituted less than one per cent of total expenses); *Sonora Community Hospital, supra,* 46 T.C. at 524, 526 (Charity work was less than one per cent of paid care); *Lorain Avenue Clinic, supra,* 31 T.C. at 146, 161. (No records were produced to show the amount of free care, if any.)

The appellant Hospital cannot be considered in the same class as the hospitals which were granted exemptions in Intercity Hospital Ass'n v. Squire, 56 F.Supp. 472 (W.D.Wash.1944) and Davis Hospital, Inc., 11 P–H Tax Ct. Mem. 344 (1945). In *Intercity Hospital,* the hospital had "an extremely liberal rule . . . concerning admittance of patients without funds . . . . no questions whatever were asked and no statement required of financial standing nor ability to pay immediately or prospectively." 56 F.Supp. at 473–474. In *Davis Hospital,* "large numbers of poor and indigent persons . . . [were admitted to the hospital although they] were financially unable to pay the cost or reasonable value of the necessary medical, surgical, nursing and hospitalization services." 11 P–H Tax Ct. Mem. at 346. Both of these institutions, unlike the appellant Hospital, had definite plans or policies for the admission of charity patients.

The Hospital refers to two other psychiatric institutions, the Shepherd-Pratte Hospital in Towson, Maryland, and the Menninger Clinic in Topeka, Kansas, as being tax exempt and having lower ratios of uncompensated services to total revenue than the appellant Hospital. The Hospital neglects to state that the Shepherd-Pratte Hospital operates a community health center and the

Menninger Clinic operates a ghetto clinic, both of which provide medical services to indigents regardless of their ability to pay. Each of these programs constitutes a specific plan or policy on the part of these two institutions for the treatment of charity patients.[2]

3) Since the doctors who were members of the Associates treated between ninety and ninety-five per cent of the patients admitted to the Hospital, they derived substantial benefit from the existence and operation of the Hospital. This was the primary source of the doctors' professional income. Although the Hospital did not pay over any of its net earnings to the Associates, except for the annual sum for supervision, this virtual monopoly by the Associates of the patients permitted benefits to inure to the Associates within the intendment of the statute. *Sonora Community Hospital, supra,* 46 T.C. at 526; 6 Mertens, Law of Federal Income Taxation, § 34.-13, at 63–64 (1968 ed.).

4) Associates also benefitted from the agreement with the Hospital whereby the Associates paid $35,000 annually as rental for office space, equipment, and business office services. See the fourth requirement of Rev.Rul. 56–185. The $35,000 amount was reduced to $15,000 as of July 1, 1968. According to Rev. Rul. 56–185, leasing office space in a hospital to doctors at a fair rental value does not *per se* detract from the charitable character of the Hospital's status, although it raises a question as to the need for further investigation. Leasing of office space to individual staff members contributes importantly to hospital functions by increasing efficiency, encouraging fuller utilization of facilities, and improving the quality of medical care. Rev.Rul. 69–464, 1969–2 Cum. Bull. 132.

The Hospital introduced the testimony of an appraiser who indicated, in sum, that the $35,000 figure was a fair rental for the office space. That essentially meant that the Associates were not adequately compensating the Hospital for the use of the equipment and business office services (including secretarial assistance). Further, when the annual rental was reduced to $15,000, the Associates were not adequately compensating the Hospital for office space alone.

5) The Associates also received a private benefit from the agreement whereby the Hospital paid an annual sum of either $25,000 or $35,000 to the Associates for hospital supervision. Although the doctors who were members of the Associates did not receive any fees from the pharmacy or laboratory, as the doctors did in *Maynard Hospital, supra,* and *Sonora Community Hospital, supra,* respectively, the doctors in the instant case did receive some compensation (a portion of the annual sum) for supervision of the pharmacy and laboratory. The other portion of the annual sum was attributed to nursing supervision and general supervision of the Hospital.

The Hospital contends that by paying this sum it was spared the cost of employing a salaried Medical Doctor, which expenditure both the Shepherd-Pratte Hospital and the Menninger Clinic had. Assuming this claim to be factually accurate in all respects, it does not in our opinion negate our conclusion that the Associates received a private benefit from the agreement between it and the Hospital analogous to the benefits conferred in *Maynard Hospital* and *Sonora Community Hospital.*

On the basis of these five factors, the judgment of the District Court is affirmed.

No costs are taxed. Each party will bear its own costs on this appeal.

2. In § III hereof we refrained from reaching a conclusion as to the validity of Rev.Rul. 69–545. We also leave open the question of whether the sole provision of an emergency room open to all constitutes a specific plan or policy for the treatment of charity patients.