## CHURCH OF GOSPEL MINISTRY, INC., Plaintiff,

v.

## UNITED STATES of America, Defendant.

### Civ. A. No. 85–1527.

United States District Court, District of Columbia.

May 30, 1986.

Peter R. Stromer, Los Gatos, Cal., James Maxwell, Washington, D.C., for plaintiff.

Edward J. Snyder, Michael J. Kearns, Gerard J. Mene, Tax Div., U.S. Dep't of Justice, Washington, D.C., for defendant.

GESELL, District Judge.

## MEMORANDUM

The Internal Revenue Service (IRS) revoked the tax-exempt status of plaintiff Church of Gospel Ministry, Inc. (CGM) on February 14, 1985, effective retroactively from the date CGM was founded in 1973. CGM now invokes this Court's special jurisdiction under 26 U.S.C. § 7428 seeking *de novo* review and a declaratory judgment that CGM is, and has always been, a corporation organized and operated exclusively for religious and charitable purposes and therefore qualified for federal income tax exemption under 26 U.S.C. § 501(c)(3) and qualified to receive deductible charitable contributions under 26 U.S.C. § 170(c)(2). CGM has exhausted its administrative remedies. At a bench trial a record containing depositions, live testimony and joint exhibits was developed and after oral argument the Court makes the following findings of fact and conclusions of law.

CGM places classified advertisements in newspapers nationwide which read:.

Become An Ordained Minister. Free Ministerial credentials legalize your right to the title "Reverend." Write Church of Gospel Ministry, _____ [1]

Anyone who answers the advertisement receives an application to become an ordained minister. To be ordained and receive credentials as a CGM minister applicants need only give their name and address and sign a statement that they are truly sincere in their will to serve the Lord. The application explains:

> The CHURCH OF GOSPEL MINISTRY has no traditional doctrine. We believe that everyone has the right to serve according to his own conviction. We recognize the right of every minister to serve GOD in his own way.... You will be entitled to preach the Gospel according to the dictation of your heart and use the title, "Reverend." [2]

All applications are granted by mail unless the applicant is obviously insincere or appears to be a minor or prison inmate.[3]

Ordination and a pocket card, which serves as CGM's credentials of ministry, are free but donations are strongly encouraged. For a donation of $10 or more, CGM offers a large certificate of ordination and for a donation of $15 or more, it will send a gold-embossed certificate. CGM actively does whatever is necessary under the local laws of each of the fifty states to assure that its ministers are recognized as ordained ministers authorized to perform marriages, memorial services, baptism, and other ministerial functions.

The application for ordination is followed by additional mailings and requests for donations. Ministers are encouraged to "counsel individuals with personal as well as spiritual problems" and are offered a certificate designating them as a "Pastoral Counselor" in exchange for a donation of $10 or more.[4] Ministers may receive an Honorary Doctorate of Divinity by donating $10 or more and filing out a one-page application in which they declare that they believe they are qualified for the degree, indicate how many hours they study the Bible, and explain what ministry means to them.[5] CGM also sends out an appeal asking all ministers to help with CGM's increasing expenses by sending a $15 donation for a annual license showing that they are an active minister.[6] For a monthly fee ministers may form an independent church chartered as a branch of CGM.[7]

In addition, CGM sends out mailings selling Bibles, marriage manuals, marriage certificates, and baptismal certificates.[8] It also distributes newsletters which report on the work of CGM, contain general statements of Christian faith and encouragement, and solicit donations.[9]

CGM exercises no control over its ministers or charter churches. It tells its new ministers that it "has no doctrine beyond belief in the existence of God, the Divinity of Christ and the Power of Prayer ... We accept the fact that more than 300 sects with faithful adherents can be found throughout the United States. We quarrel with no one." [10] CGM's founder sees it as

---

1. Joint Ex. No. 21.

2. Joint Ex. No. 31.

3. One of CGM's more elaborate advertisements explains:
   > We are happy to ordain ALL who desire to serve Him [Jesus] walking in his footsteps. We ordain as Jesus ordained. At no place in the Bible are we told that Jesus went through any elaborate ritual or ceremony to ordain his followers. He simply called upon them to "Follow Me."
   Joint Ex. 21. Inmates are not ordained and are encouraged to reapply after they are released because CGM has found that many prisoners use their spare time to write frequently and the

correspondence generated by ordaining prisoners sometimes becomes burdensome on its resources.

4. Joint Ex. No. 51.

5. Joint Ex. No. 48.

6. Joint Ex. Nos. 55, 56, 56A.

7. Joint Ex. Nos. 64, 68.

8. Joint Ex. No. 78.

9. *See, e.g.* Joint Ex. Nos. 87–91.

10. Joint Ex. No. 37.

a refuge for people who have become disgruntled with their own church or who just experience a desire at some stage of their life to become a minister. He was formerly in the mail order business and relies on his knowledge of mail order techniques to promote CGM.

CGM is run from offices in California by its president and secretary and their wives with the assistance of about half a dozen employees. CGM's officers testified that their primary activity is distributing the various mailings described above and answering the responses. Donations are used, as stated in the mailings, to pay advertising, mailing and operational expenses and salaries. Some of the remaining funds are to assist an orphanage in Mexico by sending cash, food, and other aid. Approximately 10–15% of CGM's gross income of $200,000 to $250,000 has been sent to charity in recent years and it has been the primary supporter of the Mexican orphanage. The only services conducted by CGM are brief weekday morning services attended by some of its employees at one of its corporate offices.

In order to establish that it is qualified for tax-exempt status, CGM has the burden of proving three elements contested by the IRS: (1) that CGM is a corporation operated primarily for religious and/or charitable purposes, 26 U.S.C. §§ 170(c)(2)(B), 501(c)(3); 26 C.F.R. § 1.501(c)(3)–1(c)(1); (2) that no part of CGM's net earnings inure to the benefit of any private shareholder or individual, 26 U.S.C. §§ 170(c)(2)(C), 501(c)(3); 26 C.F.R. § 1.501(c)(3)–1(c)(2), and (3) that CGM maintains records sufficient to demonstrate that it is entitled to

tax-exempt status, 26 U.S.C. § 6001; 26 C.F.R. §§ 1.6000–1(c), 31.6001–1.[11]

■ The testimony and exhibits are sufficient to establish that CGM was organized and has been operated for religious and charitable purposes. Its primary activity appears to be to solicit donations by licensing ministers who indicate they have some kind of general religious belief. Ministers are then sent periodic mailings soliciting contributions and encouraging them to pursue the will of God as they understand it. Such activity, when carried out to promote such religious beliefs, is religious activity. Cf. Universal Life Church, Inc. v. United States, 372 F.Supp. 770 (E.D.Ca. 1974). The donations are used to cover church salaries and organizational expenses or to provide financial support for an orphanage that the IRS acknowledges is a charity.

However, CGM has failed to keep records adequate to determine the full nature of its operations and failed to show that its operations do not inure in part to the private benefit of its officers. In order to claim tax-exempt status a corporation must keep records sufficient to show specifically its items of gross income, receipts and disbursements and show that it is entitled to the exemption. 26 U.S.C. § 6001; 26 C.F.R. §§ 1.6000–1(c), 31.6001–1.[12] There is no accurate record of CGM's expenses. CGM's records show numerous checks issued to cash without receipts. There is no record showing whether these funds were expended for operating costs, given to the orphanage or used for other purposes. For example, a sum of $9,400 in cash listed on CGM's books as expended

---

11. CGM is incorporated under the laws of California and it is undisputed that it satisfies the organizational test of the statute and regulations. *See* 26 U.S.C. § 170(c)(2)(A); 26 C.F.R. § 1.501(c)(3)–1(b). There is also no contention that it engages in lobbying or other political activity which would disqualify it.

12. The fact that CGM would not be required to file tax returns if it were determined to be a tax-exempt church does not remove its obligations to keep records sufficient to establish its entitlement to the exempt status. *See* 26 U.S.C.

§ 6033; 26 C.F.R. § 1.6033–2(h) (tax-exempt churches and church associations not required to file annual tax returns are not exempted from other record keeping requirements); 26 U.S.C. § 7611 (setting forth procedures for IRS examination of church records as part of inquiry into exempt status); H.Conf.R. No. 98–861, 98th Cong., 2d Sess. 1106 (1984), *reprinted in* 1984 U.S. Code Cong. & Ad.News 697, 1445, 1794 (discussing IRS authority to inspect church records to determine initial or continuing qualification for § 501(c)(3) status).

for charity was kept in a safe by CGM's officers without any record of who received these funds or any indication in the records or corporate minutes that these funds were authorized. In addition, checks are frequently given to church employees or officers to allow them to convert them to cash, without any record or receipt indicating the purpose of the expenditure.[13] CGM also pays certain personal expenses of its officers to compensate them for the use of their homes and cars for CGM business without maintaining any adequate record of these arrangements or the payments.

The failure to present adequate records also prevented CGM from meeting its burden of showing that its operations were primarily for religious or charitable purposes and did not inure to the private benefit of its officers. Indeed, the proof showed that four cash contributions of $1,500, $5,000, $5,000 and $5,000 from one individual were personally received by the president of CGM between August, 1978 and November, 1979.[14] None of these contributions were ever recorded in CGM's books or entered in its bank account. These donations would have been the largest single donations ever received by CGM. They represent about 8% of CGM's gross income in 1979 and are almost equal to its total contributions to charity that year. These missing funds and the lack of adequate records or receipts for other payments to officers and employees makes it impossible for CGM to establish that it is not being operated for the private benefit of its members and provides independent grounds for rejecting its claim to tax-exempt status. Moreover, the inadequate accounting and evidence of private inurement makes it impossible to determine whether CGM's religious and charitable activities are really its primary activities.[15]

CGM argues that these unaccounted for funds that apparently went to benefit at least one of its officers are not "net" earnings and therefore do not disqualify it for tax-exempt status. However, taking donations before they ever appear on the corporation's books deprives the organization of both its net and gross earnings. Moreover, it is precisely because there is no accurate record of expenses that it is impossible to determine where CGM's payments to its members end and its net earnings begin.

■ CGM also urges the Court to determine that it is a bona fide church under 26 U.S.C. § 170(b)(1)(A)(i), which would allow CGM contributors to deduct charitable contributions up to 50% of their contributions base in any taxable year. However, the issue of whether CGM is a "church" is irrelevant unless it first qualifies as a tax-exempt religious organization under § 170(c)(2) and § 501(c)(3). Contributions to CGM do not qualify as "charitable contributions" to a tax-exempt corporation under § 170(c)(2) because its activities inure to the private benefit of individual officers and none of its contributors can claim any deduction. Similarly, CGM's claim that it is not required to file tax returns because it is a tax-exempt church under 26 U.S.C. § 6033(b)(1) is beside the point because it cannot qualify as a § 501(c)(3) tax-exempt organization, which is a prerequisite to the § 6033 filing exemption.

CGM's complaint raises some other issues regarding the IRS's issuance of its revocation letter and the statute of limitations applicable under 26 U.S.C. § 7611. However, no relief based on these allegations was requested in the complaint, the pretrial papers or by CGM at trial and the factual allegations were never addressed at trial. In addition, even if the allegations were true they would not provide any basis for relief for CGM. The amendments to

13. *See, e.g.* Deposition of Charles Finn, pp. 147, 189–90, 201–03.

14. Joint Ex. Nos. 93–98.

15. Even if CGM were shown to be qualified for § 501(c)(3) status since CGM does not have any control or supervision over its charter churches, particularly their operation, organization and recordkeeping, there is no foundation for CGM's claim, repeated in numerous mailings, that its charter churches are entitled to claim tax-exempt status based on CGM's status.

§ 7611 CGM relys upon to challenge the IRS's actions, including the statute of limitations provisions, are only applicable to inquiries begun after December 31, 1984 and this inquiry began well before that date. P.L. 98–369, § 1033(d), 98 Stat. 494, 1039 (1984). Moreover, the amendments clearly provide that improper IRS procedures cannot be advanced as grounds for relief in a declaratory judgment proceeding. 26 U.S.C. § 7611(e) (setting forth exclusive remedy for violation of procedural requirements); H.Conf.Rep. No. 98–861, 98th Cong., 2d Sess. 1114 (1984), *reprinted in* 1984 U.S. Code Cong. & Ad.News 1445, 1802.

CGM failed to meet is burden to establish its entitlement to tax-exempt status under § 501(c)(3) and to deductible contributions under § 170(c)(2). Declaratory relief is denied and the complaint is dismissed with prejudice in an Order accompanying this Memorandum.

### ORDER

For reasons stated in a Memorandum accompanying this Order, it is hereby

ORDERED that plaintiff's petition for declaratory relief under 26 U.S.C. § 7428 is denied on the merits for lack of proof and the complaint is dismissed with prejudice; and it is further

ORDERED that defendant United States is awarded its costs from plaintiff Church of Gospel Ministry, Inc., as set by the Clerk.