**CHURCH OF SCIENTOLOGY OF CALI-FORNIA, Petitioner-Appellant,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 85–7324.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 8, 1986.

Decided July 28, 1987.

**1312**

Christopher Cobb, Pasadena, Cal., Richard Riley, Washington, D.C. and Eric Lieberman, New York City, for petitioner-appellant.

Steven Frahm, Washington, D.C., for respondent-appellee.

Lee Boothby, Berrien Springs, Mich. and Gerald McNally, Jr., Glendale, Cal., for amicus-curiae.

Before TANG and BRUNETTI, Circuit Judges, and JAMESON,* District Judge.

TANG, Circuit Judge:

The Church of Scientology (Church) appeals a judgment of the Tax Court which affirmed the Commissioner's assessment of tax deficiencies and late filing penalties against the Church for the years 1970, 1971 and 1972. At issue is whether the Commissioner properly revoked the Church's tax exempt status.

### I.

The Church was incorporated as a non-profit corporation in the State of California in 1954. In 1957, the Commissioner recognized it as a tax exempt organization under § 501(c)(3) of the Internal Revenue Code of 1954.[1] The Commissioner revoked the Church's tax exempt status in 1967. The letter of revocation stated that the Church was "engaged in a business for profit," and was "operated in a manner whereby a portion of [its] earnings inure[d] to the benefit of a private individual," and was "serving a private, rather than a public interest." The letter instructed the Church to file federal income tax returns. The IRS subsequently published a notice of revocation in the Internal Revenue Service bulletin, and removed the Church from the Service's official roster of organizations eligible to receive tax deductible charitable donations. The Church did not file income tax returns for the years 1970 through 1972, instead, it submitted Form 990, information returns. On December 28, 1977, after auditing the Church's records, the IRS sent a Notice of Deficiency for the years 1970, 1971, and 1972. The IRS calculated the deficiency to be $1,150,458.87 and imposed an additional $287,614.71 in late filing penalties.[2]

On March 28, 1978, the Church filed suit in United States Tax Court challenging the Commissioner's determination of tax deficiency. In an extensive opinion, the Tax Court substantially upheld the determination of the Commissioner. 83 T.C. 381 (1984). It held that the Church did not qualify for exemption from taxation under §§ 501(a) & 501(c)(3) because: (1) the Church was operated for a substantial commercial purpose; (2) its earnings inured to

---

\* Honorable William J. Jameson, Senior United States District Judge, District of Montana, sitting by designation.

1. Codified as amended at 26 U.S.C. § 501(c)(3) (1982).

2. The IRS may impose a penalty in addition to the tax for failure to file tax returns under 26 U.S.C. § 6651(a).

the benefit of L. Ron Hubbard, his family, and OTC, a private non-charitable corporation controlled by key Scientology officials; and (3) it violated well defined standards of public policy by conspiring to prevent the IRS from assessing and collecting taxes owed by the Church. The Court also upheld the validity of the Notice of Deficiency.[3] Finally, the Court upheld the penalties for failure to file tax returns.

## II.

During the years in question, the Church of Scientology of California was the "Mother Church" of the many Scientology churches around the country. The Church propagated the Scientology faith, a religion founded by L. Ron Hubbard, through such means as the indoctrination of laity, training and ordination of ministers, creation of congregations, and provision of support to affiliated organizations.

Scientology teaches that the individual is a spiritual being having a mind and body. Part of the mind, called the "reactive mind" is unconscious and filled with mental images that are frequently the source of irrational behavior. Through the administration of a process known as "auditing" a parishioner, called a "pre-clear," is helped to erase his or her reactive mind and gain spiritual awareness. Auditing is administered individually by a trained "auditor." The auditor poses questions to the pre-clear and measures the latter's response with an electronic device call an "E–Meter" that is attached to the skin. The E–Meter assists in the identification of spiritual difficulty. Scientology teaches that spiritual awareness is achieved in stages. A disciple achieves different levels of awareness through additional auditing. The religion also offers courses to train auditors.

Scientology teaches that people should pay for whatever of value they receive. This is called the "Doctrine of Exchange." Toward the realization of this doctrine, branch churches exacted a "fixed donation" for training and auditing. Fixed donations were not based on ability to pay and with few exceptions, services were not given for free.

Scientology is an international religion with numerous churches around the world. In the 1970's, these churches were organized along hierarchical lines according to the level of services they were authorized to provide. Churches that delivered services at the lowest levels were called "franchises" and later "missions." "Class IV orgs" delivered auditing through "grade IV" and training through "level IV." "St. Hill organizations" and "advanced organizations" offered intermediate and higher level services. The branch known as "Flag" offered the highest level of training and auditing.

The California Church consisted of several divisions. The San Francisco Organization and the Los Angeles Organization were both class IV organizations. The American St. Hill Organization was located in Los Angeles and offered intermediate auditing and training. The Advanced Organization of Los Angeles provided high levels of auditing and training to persons who had completed services at a class IV organization. The Flag Operations Liaison Office, located in Los Angeles, was an administrative unit of the California Church.

In addition to auditing and training, the Church provided assistance to prisoners, ex-offenders, the elderly, the mentally ill and drug addicts. On occasion the Church assisted the poor and the sick. The Church performed christenings, funerals and wedding ceremonies free of charge, and conducted regular Sunday services. The Church's chaplain provided marriage and family counseling free of charge. The Church also provided free, a specialized form of auditing geared to help people in crisis.

Flag was the highest division of the California Church. It provided spiritual leadership. It also acted as the Church's administrative center. The Flag division was headquartered aboard the ship *Apollo*,

---

**3.** However, the Court found that the IRS erred in including payments from the United Kingdom Church in the Church's income because it found that the United Kingdom Church was a branch of the Church, and that the payments were internal transfers of funds.

which cruised the Mediterranean Sea and docked in various countries along its shores. L. Ron Hubbard, his wife, Mary Sue, and their family lived aboard the *Apollo* with other members of the ship's crew and staff. Besides performing the highest levels of auditing and training, Flag staff members performed a variety of management functions. The Church's other divisions and other Scientology churches sent reports on a regular basis to Flag. These reports supplied information, often in statistical form, about the organization's operations. Flag staff, on the basis of the review of these reports, issued policy letters, directives, and other kinds of administrative advice geared to improving local church operations. Flag personnel also researched and developed programs for improving the administration of local churches. Flag sent teams of specialists to help other units or churches experiencing management difficulties.

The Church derived income from four sources: (1) auditing and training; (2) sales of Scientology literature, recordings and E-meters; (3) franchise operations; and (4) management services. Franchise operators were required to remit ten percent of gross income to the Church. The Church offered its managerial services to branch organizations around the world for a fixed fee.

One of the policy directives of the Church was to "MAKE MONEY". The Church frequently engaged in aggressive promotion of its products and services. This promotion included market surveys and advertisements. In addition, the Church trained staff members in salesmanship techniques.

L. Ron Hubbard officially resigned his position as executive head of the California and other Scientology churches in 1966. Despite his official resignation, the Tax Court found that he continued to exert significant control over the Church by making policy statements, directives, and orders. In addition, his approval was required for all financial planning. He was the sole trustee of a major Scientology trust fund into which the Church made substantial payments. He or Mary Sue Hubbard were signatories on many Church bank accounts.

During the tax years at issue, L. Ron Hubbard and Mary Sue Hubbard received salaries from the California Church and its affiliate, the United Kingdom Church, in the following amounts:

| | 1970 | 1971 | 1972 |
|---|---|---|---|
| *California Church* | | | |
| L. Ron Hubbard | $ 4,932 | $ 9,368 | $ 35,000 |
| Mary Sue Hubbard | $ 3,017 | $ 2,430 | $ 25,000 |
| *United Kingdom Church* | | | |
| L. Ron & Mary Sue | | | |
| Hubbard Combined | $12,300 | $37,850 | $ 55,680 |
| TOTAL | $20,249 | $49,648 | $115,680 |

During these years, L. Ron Hubbard, Mary Sue Hubbard and their four children resided for the most part aboard the *Apollo*. While aboard ship, the Church provided the Hubbards with free lodging, food, laundry, medical services and vitamins.

The Church made royalty payments to L. Ron Hubbard for sales of his books, tapes and E-meters. The royalties amounted to ten percent of the retail price. The Church, for example, made $104,618.27 in royalty payments to Hubbard in 1972. Additionally, Church policy required that all work pertaining to Scientology and Dianetics be copyrighted to L. Ron Hubbard. As the result of this policy, a number of publications copyrighted by L. Ron Hubbard were actually written by others. For example, Ruth Mitchell wrote the book *Know Your People* and Peter Gillum wrote the book *How to be Successful.* Additionally, a series of books called the OEC series contained policy letters, some written by L. Ron Hubbard and others written by paid employees of the Church. L. Ron Hubbard received royalty payments on the sale of all of these publications.

During the 1960's, Scientology organizations around the world were required to pay directly to L. Ron Hubbard, ten percent of their income. These payments were termed "debt repayments" because they were designed to compensate Hubbard for his work in originating the Scientology religion. The Tax Court concluded

that during 1971–1972 the Church continued to make debt repayments to Hubbard.

In 1968, L. Ron Hubbard, Mary Sue Hubbard, and Leon Steinberg incorporated a Panamanian corporation called Operation Transport Corp., Ltd. (OTC). OTC was a for-profit corporation. Shortly after the corporation's formation, Hubbard, Mary Sue Hubbard and Steinberg resigned and were replaced by three Flag employees. During the years in question, the new directors performed only one function. In the summer of 1972, they approved L. Ron Hubbard's decision to transfer approximately two million dollars from an OTC bank account in Switzerland to the *Apollo*. The money was stored in a locked file cabinet to which Mary Sue Hubbard had the only set of keys.

Between 1971 and 1972, the Church made payments in excess of three and a half million dollars to OTC. During these years, the Church also made payments totaling nearly $175,000 to the Central Defense and Dissemination Fund. According to the Church, these payments were placed in the United States Church of Scientology Trust of which L. Ron Hubbard was the sole trustee. The trust funds were deposited in several Swiss bank accounts. L. Ron Hubbard and Mary Sue Hubbard were signatories of the accounts and L. Ron Hubbard kept the trust checkbooks.

### III.

#### A. *Tax Exemption*

■ Internal Revenue Code § 501 exempts certain organizations from taxation. Section 501(c)(3) exempts:

> corporations and any community chest, fund, or foundation, organized and operated exclusively for religious ... purposes, ... no part of the net earnings of which inures to the benefit of any private shareholder or individual....

To qualify for exemption, a church must show that it is (1) organized, and (2) operated, exclusively for religious or charitable purposes. *Hall v. Commissioner*, 729 F.2d 632, 634 (9th Cir.1984).

The Church strenuously argues that the trial court failed to recognize it as a bona fide religion. This argument goes to whether the Church meets the organizational test. Neither the Commissioner, nor the Tax Court, nor this court questions that the Church of Scientology of California was organized for a bona fide religious purpose. The only question before the court, is whether the Church met the second requirement for tax exempt status, the operational test.

■ Four elements compose the operational test. First, the organization must engage primarily in activities which accomplish one or more of the exempt purposes specified in § 501(c)(3). Treas.Reg. § 1.501(c)(3)–1(c)(1); *Church by Mail, Inc. v. Commissioner*, 765 F.2d 1387, 1391 (9th Cir.1985). Second, the organization's net earnings may not inure to the benefit of private shareholders or individuals. Treas. Reg. § 1.501(c)(3)–1(c)(2); *Church by Mail*, 765 F.2d at 1391. Third, the organization must not expend a substantial part of its resources attempting to influence legislation or political campaigns. Treas.Reg. § 1.501(c)(3)–1(c)(3); *Church by Mail*, 765 F.2d at 1391. Courts have imposed a fourth element. Organizations seeking exemption from taxes must serve a valid public purpose and confer a public benefit. *Bob Jones University v. United States*, 461 U.S. 574, 585–92, 103 S.Ct. 2017, 2025–29, 76 L.Ed.2d 157 (1983). If an organization fails to comply with any one of these four elements, it will fail the operational test and lose its eligibility for tax exempt status. *Harding Hospital, Inc. v. United States*, 505 F.2d 1068, 1072 (6th Cir.1974).

We conclude that the Church failed to establish that "no part of the net earnings ... inures to the benefit of any private shareholder or individual...." 26 U.S.C. § 501(c)(3). Because we may affirm the Tax Court on this ground, we do not reach the questions of whether the Church operated for a substantial commercial purpose or whether it violated public policy.

#### B. *Inurement*

Congress conferred tax exemption on churches and other organizations in recog-

nition of the benefit society derives from the activities of these organizations. *Harding Hospital,* 505 F.2d at 1071; *Founding Church of Scientology v. United States,* 412 F.2d 1197, 1199, 188 Ct.Cl. 490 (1969), *cert. denied,* 397 U.S. 1009, 90 S.Ct. 1237, 25 L.Ed.2d 422 (1970). The government leaves funds in the hands of charitable organizations rather than taxing them and spending the funds on public projects. Implicit in this purpose is that charities must promote the public good to qualify for tax exemption. *Presbyterian and Reformed Publishing Co. v. Commissioner,* 743 F.2d 148, 153 (3d Cir.1984).

Section 501(c)(3) embodies this policy. Churches are eligible for tax exempt status only if no part of their net earnings inure to the benefit of private individuals. Each phrase of the statute has significance. The term "no part" is absolute. The organization loses tax exempt status if even a small percentage of income inures to a private individual. *Founding Church,* 412 F.2d at 1200; *Spokane Motorcycle Club v. United States,* 222 F.Supp. 151, 153 (E.D. Wash.1963). The sole beneficiary of the church's activities must be the public at large. *Founding Church,* 412 F.2d at 1199.

Courts have construed broadly the term "net earnings". *Hall,* 729 F.2d at 634. "Net earnings" includes more than gross receipts minus disbursements as shown on the books of the organization. *Harding Hospital,* 505 F.2d at 1072. Only those ordinary expenses necessary to the operation of the church are not included in net earnings. *Founding Church,* 412 F.2d at 1200.

The heart of § 501(c)(3) tax exempt status is the phrase "inures to the benefit." Payment of reasonable salaries to church officials does not constitute inurement. *Bubbling Well Church of Universal Love v. Commissioner,* 670 F.2d 104, 105 (9th Cir.1981). However, payment of excessive salaries will result in a finding of inurement. *Id.* Inurement can also result from distributions other than the payment of excessive salaries. *See Founding Church,* 412 F.2d at 1200 (ten percent of gross income of affiliated Scientology organizations paid to L. Ron Hubbard); *General Contractors' Ass'n of Milwaukee v. United States,* 202 F.2d 633 (7th Cir.1953) (reports and surveys furnished to members); *Spokane Motorcycle Club,* 222 F.Supp. 151 (goods, services, and refreshments given to members). Unaccounted for diversions of a charitable organization's resources by one who has complete and unfettered control can constitute inurement. *Parker v. Commissioner,* 365 F.2d 792, 799 (8th Cir. 1966), *cert. denied,* 385 U.S. 1026, 87 S.Ct. 752, 17 L.Ed.2d 674 (1967); *Kenner v. Commissioner,* 318 F.2d 632 (7th Cir.1963).

Finally, the regulations define "private shareholder or individual" broadly as any person "having a personal and private interest in the activities of the organization." 26 C.F.R. 1.501(a)–1(c).

While we remain solicitous of Congress' intent to confer tax exempt status on religious organizations, this court has previously affirmed the denial of tax exemption where church income inures to private individuals. In *Church by Mail,* the Commissioner denied the Church's application for tax exempt status. Two individuals, Reverend Ewing and Reverend McElrath, ran a church that mailed printed sermons to several million homes. They also owned Twentieth Century Advertising Agency which provided the Church's printing and mailing services. We found that the salaries paid to Reverend Ewing and Reverend McElrath by the Church and Twentieth Century were excessive. We rejected the Church's argument that the income paid by Twentieth Century should not be included because Twentieth Century, a for-profit company, simply funneled church income to Reverends Ewing and McElrath. 765 F.2d at 1393. Similarly, in *Hall,* we held that William and Lorna Hall were not entitled to a charitable donation deduction for money donated to the Church of the United Brotherhood (CUB). CUB failed to qualify as a charitable organization because its major purpose was to funnel rental income to the Halls. 729 F.2d at 634. In *Bubbling Well Church,* we upheld the Tax Court's denial of the Church's applica-

tion for tax exempt status. Three members of one family were the sole employees and voting directors of the Church. The Church paid a substantial portion of its income to the three family members. We held that the Church failed to carry its burden to prove that the salary and benefits paid to the family members were reasonable. 670 F.2d at 106. These cases emphasize that excessive compensation and potential for abuse, even absent a showing of actual abuse, will constitute inurement.[4]

The finding of the Tax Court that a portion of the Church's net earnings inured to the benefit of L. Ron Hubbard, his family, and OTC, a private for-profit corporation, is a factual finding. *See Bubbling Well Church,* 670 F.2d at 106; *cf. Church By Mail,* 765 F.2d at 1390 (whether Church is operated for a non-exempt purpose is a factual finding). We review this finding for clear error. *Bubbling Well Church,* 670 F.2d at 106.

■ The taxpayer has the burden to demonstrate that it is entitled to tax exempt status. *Church by Mail,* 765 F.2d at 1391. This is especially true in situations where there is a great potential for abuse created by one individual's control of the church. *See Bubbling Well Church,* 670 F.2d at 105. The Church must come forward with candid disclosure of the facts bearing on the exemption application. *Id.* Doubts will be resolved in favor of the government. *Harding Hospital,* 505 F.2d at 1071.

In finding that a portion of the Church's net earnings inured to the benefit of L. Ron Hubbard, his family and OTC, the court isolated two indicia of inurement, overt and covert. The overt indicia included salaries, living expenses, and royalties. The covert indicia included "debt repayments" and L. Ron Hubbard's unfettered control over millions of dollars of Church assets. The court concluded that these indicia, when viewed in light of the self-dealing associated with them, coupled with the Church's

failure to carry its burden of proof and to disclose the facts candidly, proved conclusively that the Church was operated for the benefit of L. Ron Hubbard and his family.

The Church challenges the overt indicia of inurement on the ground that the salaries, expenses and royalties, were reasonable. It notes that the court did not find them unreasonable, considered separately. The Church questions the logic of the finding that several reasonable payments add up to inurement.

■ The Church paid L. Ron Hubbard and Mary Sue Hubbard combined salaries of $20,249 in 1970, $49,648 in 1971 and $115,680 in 1972. We cannot say that these salaries were excessive.

In addition to Hubbard's salary, the Church paid for all of the Hubbards' living and medical expenses aboard the cruise ship *Apollo.* These expenses amounted to about $30,000 per year. Because it is unnecessary to our decision, we express no opinion on whether supporting a Church's founder and his family aboard a yacht cruising the Mediterranean constitutes a reasonable Church expense.

■ The Church also paid substantial royalties to L. Ron Hubbard for his books, recordings and E-meters. Churches, especially less established ones, rely on the distribution of church literature to propagate their beliefs. Financing church operations through the sale of religious literature does not necessarily violate the requirements for tax exemption. *See Presbyterian and Reformed Publishing Co.,* 743 F.2d at 158–59. Furthermore, a church may pay the author reasonable compensation in the form of royalties for his literary works. However, the payments in this case, cross the line between reasonable and excessive. Here, the evidence indicates that Hubbard used the Church to generate copyrighted literature and market his products. Scientology policy mandated that

---

**4.** We recognize that not every instance in which payments are made to private individuals will result in inurement. *See e.g., Presbyterian and Reformed Publishing Co. v. Commissioner,* 743 F.2d 148 (3d Cir.1984). In *Presbyterian and Reformed Publishing,* the Third Circuit reversed the Tax Court's denial of tax exempt status because the publishing company paid nothing more than reasonable salaries to the founder's family and employees.

any book on Dianetics and Scientology be copyrighted in the name of L. Ron Hubbard. Pursuant to this policy, a number of publications copyrighted by L. Ron Hubbard were actually written by Church employees. Furthermore, the Church encouraged its staff members to market aggressively his products. We agree with the Tax Court that the royalty payments support a finding of inurement.

◼ The Church argues that the evidence does not support the Tax Court's finding of covert inurement. However, the record reveals that L. Ron Hubbard had unfettered control over millions of dollars in Church assets. The Church transferred several million dollars to OTC during 1970–72. These payments were designated as "charter mission expenses." L. Ron Hubbard and Mary Sue Hubbard controlled OTC funds. Sometime during 1972, OTC transferred approximately two million dollars from OTC bank accounts in Switzerland to the *Apollo*. The finding that OTC was a sham corporation is sustained. During the tax years in question OTC funneled millions of dollars of Church assets to L. Ron Hubbard. *See Church by Mail, Inc.*, 765 F.2d at 1393; *Hall*, 729 F.2d at 634.

The record also supports the Tax Court's conclusion that L. Ron Hubbard had unfettered control over Church of Scientology Trust Fund assets. The Church deducted payments of $28,930.34 in 1970, $67,892.40 in 1971, and $77,986.62 in 1972 to the Central Defense and Dissemination Fund. According to the Church, these payments were made to the United States Church of Scientology Trust. L. Ron Hubbard was the sole trustee of the Trust during the years in question. Trust funds were deposited in several Swiss bank accounts. L. Ron Hubbard and Mary Sue Hubbard were two of the three signatories on the Trust accounts. L. Ron Hubbard kept the Trust checkbooks. In 1972, over a million dollars was withdrawn from the Trust accounts in Switzerland and brought aboard the *Apollo* where it was kept in a locked file cabinet. Mary Sue Hubbard had the only keys to the cabinet.

The Church disputes that control over assets compels a finding of inurement. It argues that every Sunday morning pastors all over America collect money from parishioners and hold that money for Church uses. It asserts that OTC funds were used for expenses associated with operation of the *Apollo* and in providing banking services for Flag. Witnesses testified that the Church used Trust monies to defend Scientology against attack and to propagate the religion. Finally, the Church argues that the three million dollars brought aboard the *Apollo* from the OTC and Trust accounts remained on the *Apollo* during the years in question. It cites the testimony of a Trust accountant who counted the cash aboard the *Apollo* and testified that none of it was missing.

We find these arguments unpersuasive. Unlike the typical Saturday or Sunday when parishioners donate their money to the church, here the Church transferred millions of dollars to bank accounts controlled by a private individual who had no official responsibility for managing church assets. Although witnesses testified that the money was used for Church purposes, the Church presented little documentation to show that the majority of Trust or OTC money was actually spent on bona-fide Church activities. Finally, the self-serving testimony of a Church employee that the three million dollars remained in the *Apollo* safe proves nothing. The fact that there were three million dollars in the safe on the day the Church accountant checked, is not inconsistent with the Tax Court's finding that L. Ron Hubbard had unfettered control over millions of dollars in money that originated with the Church. The Church failed to come forward with testimony from key individuals such as L. Ron Hubbard and Mary Sue Hubbard and failed to present the documentation necessary to trace the source and use of OTC and Trust monies. In sum, the Church failed to carry its burden of proof in a situation where "the potential for abuse created by the [founder's] control of the Church required open and candid disclosure of facts bearing on the exemption application." *Bubbling Well Church*, 670 F.2d at 105.

The Tax Court found that Church income inured to the benefit of L. Ron Hubbard in a "grand scale" in the form of "debt repayments." During the 1950's, Hubbard was paid a portion of the gross income of Scientology congregations, franchises and organizations. *Founding Church,* 412 F.2d at 1199. This compensation scheme was called the "proportional pay plan." During the 1960's these tithes became known as "Founding Debt Payments" (sometimes also called "LRH RR" or "LRH 10%s").

■ Although the form changed, the payments continued through the years at issue in this case. Church records indicate that between October 9, 1972 and December 28, 1972, it made debt repayments totaling $19,324.41. A policy letter dated September 7, 1972 entitled "Repayment or Due Money Collected for LRH Personally" set out a program to reimburse Hubbard for past use of Hubbard's personal income and capital; research and development of the technology of Dianetics and Scientology; and the use of Hubbard's goodwill and high credit rating. The letter establishes the post of "LRH accounts officer" to monitor collection of debt repayments.

The Church argues that the Tax Court's finding of continued debt repayments is clearly erroneous. The policy letter establishing the post of "LRH accounts officer" was canceled two days after it was promulgated. According to the Church, the only credible evidence of payments were the checks issued between October and December 1972. It contends that these payments, even though invoiced in the Church's records as "Per HCO Policy Letter 7 Sept. 72", "LRH Repayments," and "Founding Debt Payment," were actually deposited in an OTC bank account for the benefit of the Church. Finally, even if the evidence is believed, argues the Church, it accounts for only a four-month period and is insufficient to support revocation of tax exemption for all three years.

These arguments are unavailing. Even though the payments were called debt repayments, the Church produced no evidence of bona fide indebtedness. The typical indicia of a debt are a sum certain

payable over a specific period of time at a stipulated rate of interest. Here, the evidence indicates a continuing obligation to make uncertain payments based on a percentage of the Church's total receipts. In enforcing federal tax laws, courts look to the substance of a transaction rather than its form. *Commissioner v. Court Holding Co.,* 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945). These payments more closely resemble tithes to L. Ron Hubbard than debt repayments. It makes no difference whether the $19,000 was the tip of the iceberg, as the Tax Court concluded, or the total of all debt repayments made by the Church. *No part* of the Church's income could inure to L. Ron Hubbard if it was to maintain tax exempt status. *Founding Church,* 412 F.2d at 1200. Even if the money went into an OTC account, it inured to the benefit of L. Ron Hubbard because he had unrestrained and unaccounted for access to that account. *See Parker,* 365 F.2d at 799. The Church failed to come forward with credible proof that the funds were actually spent on behalf of the Church. *Bubbling Well Church,* 670 F.2d at 106.

In sum, we hold that significant sums of Church money inured to the benefit of L. Ron Hubbard and his family during the tax years 1970, 1971 and 1972. Although neither the salaries nor the living expenses necessarily constituted evidence of inurement, the cumulative effect of Hubbard's use of the Church to promote royalty income, Hubbard's unfettered control over millions of dollars of church assets, and his receipt of untold thousands of dollars worth of "debt repayments" strongly demonstrate inurement. We find no clear error.

### C. *Validity of Notice of Deficiency*

The Church mounts two attacks on the notice of deficiency. First, it alleges that the notice was void because the 1967 revocation letter was unconstitutional. Second, it contends that the notice was void or voidable due to administrative defects.

### 1. *Constitutional Challenge*

■ The Church asserts that the IRS was motivated by hostility towards Scientology as a religion in issuing the 1967 letter revoking the Church's tax exempt status. The first amendment imposes an obligation of neutrality on the government in its dealings with religious organizations. *See Sherbert v. Verner*, 374 U.S. 398, 402, 83 S.Ct. 1790, 1792, 10 L.Ed.2d 965 (1963). The question of whether the Commissioner was motivated by religious animus turns on subjective intent. Normally, the determination of a party's "actual motive" is the type of mixed question of law and fact which we review for clear error. *United States v. McConney*, 728 F.2d 1195, 1203 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). However, when questions of motive implicate constitutional rights, we review de novo. *See Standard Oil Co. of California v. Arizona*, 738 F.2d 1021, 1023 (9th Cir. 1984), *cert. denied*, 469 U.S. 1132, 105 S.Ct. 815, 83 L.Ed.2d 807 (1985); *McConney*, 728 F.2d at 1203.

As proof of the Commissioner's enmity, the Church cites a record of harassment dating back to 1958. Essentially, the Church contends that it was singled out for revocation. In 1959, the IRS revoked the tax exempt status of the Founding Church. In 1963, Food and Drug Administration agents raided the Founding Church and seized E–meters and Scientology literature on the grounds of "false or misleading labeling." *Founding Church of Scientology v. United States*, 409 F.2d 1146, 1148 (D.C.Cir.1969). The Church alleged that in the mid–60's the Department of Justice targeted all Scientology churches for revocation of tax exempt status. Memoranda and correspondence in IRS files contained statements antagonistic to the Church. IRS agents called Scientology a "medical quackery," a "threat to the community, medically, morally and socially," a "prey on the public pocketbook," and similar epithets. Between 1969 and 1975 the IRS established three special intelligence units to collect information about taxpayers and to monitor their compliance with tax laws. All three units collected information on the Church and other groups such as the Black United Front, the New Left Movement and the Welfare Rights Organization.

Despite these facts, the record bears out the trial court's conclusion that the IRS revoked the Church's exemption based upon legitimate agency concerns. The IRS examined the Church's records in 1965 and again in 1966. On July 29, 1966, the IRS sent a letter to the Church stating that it was considering revocation of its tax exempt status because: (1) the Church's income inured to the benefit of Scientology practitioners; (2) the Church's activities were commercial; and (3) the Church was serving the private interest of L. Ron Hubbard and Scientology practitioners. The agency then held two protest conferences and finally issued a formal letter of revocation on July 18, 1967 stating the same three grounds of revocation. During 1969 and 1970, the IRS examined the Church's records for the taxable years 1964–67 and, in a second audit, the years 1968 and 1969. In 1974, the IRS mailed a notice of deficiency to the Church for the taxable years 1965 through 1967. The Church filed the petition in the Tax Court for the 1965 deficiency and in late 1976 the IRS settled the case by conceding the petitioners' tax exempt status for that year without prejudice to any other year. In 1975 and 1976 the IRS audited the California Church for the taxable years 1971 through 1974. The agents examined between 200 and 300 cartons of records containing approximately two million documents. Based on the findings of that audit, the parties attempted settlement negotiations. Finally, in December of 1977, the IRS issued a notice of deficiency for the tax years 1970, 1971 and 1972.

■ Even examining the IRS's actions under the selective prosecution standard—a standard which is arguably too stringent for review of a mere revocation of tax exempt status—we cannot hold that there is any impropriety in this revocation. *See Karme v. Commissioner*, 673 F.2d 1062, 1064 (9th Cir.1982). The standard we apply in cases of alleged discriminatory prosecution is:

(1) That others are generally not prosecuted for the same conduct;

(2) The decision to prosecute this defendant was based upon impermissible grounds such as race, religion or the exercise of constitutional rights.

*Id.*

 The Church has not shown discriminatory selection even under the stringent criminal standard. The IRS has revoked the tax exempt status of many other churches. *See e.g., Presbyterian and Reformed Publishing Co.,* 743 F.2d 148 (reversing the IRS's revocation); *Bethel Conservative Mennonite Church v. Commissioner,* 746 F.2d 388 (7th Cir.1984) (reversing IRS's revocation); *Church of Gospel Ministry, Inc. v. United States,* 640 F.Supp. 96 (D.D.C.1986) (upholding the IRS's revocation). Nor has the Church proven the second prong. Although there is evidence of religious animus, the overwhelming weight of the evidence indicates that the IRS concluded that the Church did not conform to the requirements of section 501(c)(3) based upon exhaustive and responsible investigation. Accordingly, we reject the Church's argument that the notice of deficiency was unconstitutional.

### 2. *Administrative Defects*

The IRS revoked the Church's tax exempt status by letter dated July 18, 1967. After fruitless negotiations, the IRS issued a notice of deficiency to the Church on June 7, 1974 covering the years 1965 through 1967. The Church argues that, because the IRS settled the case by stipulating that the Church owed no deficiency for 1965, the revocation letter was constructively revoked. Thus, argues the Church, the 1977 notice of deficiency, relating to the years 1970 through 1972, was void because the Church was still a recognized tax exempt organization. The Church cites *A. Duda & Sons Cooperative Ass'n v. United States,* 504 F.2d 970 (5th Cir.1974).

 We disagree with the Church's analysis. Although the IRS abandoned its attempt to collect taxes for the years 1965 through 1967, it never abandoned its 1967 determination that the Church was no longer eligible for tax exempt status. In fact, the stipulation expressly stated that the concession was "without prejudice to [the Church] or [the Commissioner] with respect to any other taxable year...." *A. Duda & Sons* is inapposite. In that case, the Commissioner expressly conceded that the grounds for revocation were erroneous. 504 F.2d at 975. In this case, the Commissioner never made such a concession; in fact today we hold that one of the stated grounds, inurement, was valid. In sum, we hold that the 1967 revocation letter was not constructively revoked.

### D. *Validity of Late Filing Penalties*

The Commissioner imposed an additional penalty on the Church in the amount of $287,615 for failing to file a corporate tax return for the years in question. Internal Revenue Code § 6651(a)(1) reads in pertinent part:

In case of failure ... to file any return ... on the date prescribed therefor ..., *unless it is shown that such failure is due to reasonable cause and not due to willful neglect,* there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate.... (emphasis added)

The regulations provide that, to demonstrate reasonable cause a taxpayer must show that it "exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time...." 26 C.F.R. § 301.6651–1(c)(1). What elements constitute reasonable cause is a question of law which we review de novo. *United States v. Boyle,* 469 U.S. 241, 105 S.Ct. 687, 692 n. 8, 83 L.Ed.2d 622 (1985).

 The Church argues that the IRS waived its right to impose the penalty because it accepted the Church's Form 990 and even extended the time for filing. This waiver, argues the Church, constitutes

"reasonable cause" for failing to file corporate returns. The taxpayer carries the burden to show reasonable cause for failing to file the required return. *Funk v. Commissioner*, 687 F.2d 264, 266 (8th Cir.1982). The IRS expressly revoked the Church's tax exempt status in the July 18, 1967 letter which instructed the Church thereafter to file federal tax returns. We agree with the Tax Court that "[the Church's] unilateral doubts about [the revocation letter's] effectiveness are not 'reasonable cause' for its failure to file a proper return." 83 T.C. at 526.

Secondly, the Church argues that its reliance on the advice of tax professionals that the Form 990 would be acceptable, constitutes reasonable cause. The Supreme Court recently held that a taxpayer's failure to file a timely return, in reliance upon an attorney's advice did not constitute "reasonable cause" under § 6651(a)(1). *Boyle*, 105 S.Ct. at 693–94. Likewise, we hold that a taxpayer's failure to file the proper form, in reliance upon an attorney's advice is not "reasonable cause" where the IRS has expressly instructed the taxpayer to file a tax return.

## IV.

We affirm the Tax Court decision upholding the Commissioner's revocation of the Church of Scientology of California's tax exempt status on the ground that a portion of its income inured to the benefit of L. Ron Hubbard and others. We reject the Church's argument that the notice of deficiency was constitutionally and administratively defective. Finally, we uphold the Commissioner's imposition of a penalty on the Church for failure to file the proper returns.